## ADOPTION OF FRAN
## (and two companion cases[1]).

No. 01-P-66.

Bristol. June 28, 2001. - April 11, 2002.

Present: KANTROWITZ, COWIN, & McHUGH, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Adoption, Care and protection of minor, Dispensing with parent's consent to adoption. *Evidence,* Child custody proceeding. *Practice, Civil,* Findings by judge.

In a proceeding to dispense with parental consent to adoption, the judge's findings were supported by a preponderance of evidence in the record, and, taken together, constituted clear and convincing evidence of the father's current parental unfitness requiring the allowance of petitions brought by the Department of Social Services under G. L. c. 210, § 3, to dispense with the father's consent to the adoption of his three children. [458-464]

A guardian ad litem's report in a proceeding to dispense with parental consent to adoption did not amount to impermissible "profile" testimony with regard to a group to which the children's father belonged, where the report did not reason from general characteristics to a conclusion that specific acts had occurred, but used facts about certain behavior of group members to reach conclusions about the group's nature and likely future course. [464-465]

There was no merit to the argument by the father in a proceeding to dispense with his consent to the adoption of his children that his right to testify was impermissibly chilled when the judge told him that his failure to take an oath meant that, in the judge's view, he would not be telling the truth. [465-468]

PETITIONS filed in the Attleboro Division of the Juvenile Court Department on November 10, 1999.

The cases were heard by *Kenneth P. Nasif,* J.

*Joseph J. Mazza* for the father.

*Virginia A. Peel* for Department of Social Services.

*David A.F. Lewis* for the children.

McHUGH, J. When this litigation began, Fran, Sally, and Jane,

---

[1]Adoption of Sally and Adoption of Jane. As is our convention in such matters, all the children's names used in the following discussion are pseudonyms.

now respectively aged eight, six and one-half, and five and one-half years, were living with their father and mother and a group of other adults and children in an environment permeated by strict and unyielding adherence to the group's religious beliefs. On November 10, 1999, after an investigation by the Attleboro and Seekonk police departments and the Department of Social Services (DSS), a juvenile court judge entered emergency orders awarding DSS temporary custody of the children. See G. L. c. 119, § 24. Following a trial held nine months later, the court entered decrees terminating parental rights. The father has appealed[2] claiming that several of the trial judge's findings are not supported by a preponderance of the evidence and that his parental unfitness was not proved by clear and convincing evidence. He also asserts that the guardian ad litem's report amounted to impermissible "profile" testimony and that the trial judge improperly "chilled" his right to testify. After careful review of the record, we are persuaded that, overall, the judgments rest on a solid foundation and, therefore, affirm.

The basic background facts are not in serious dispute. When they first came to the attention of authorities in November of 1999, the father, the mother, and the three girls were living in Attleboro with a group composed of two interrelated, extended families. The group totaled approximately twenty-eight persons, thirteen of whom were children. A common set of religious beliefs bound the group together. Among other things, those beliefs required abstinence from most worldly connections including medicine, banking, employment, and schooling for the children. With the exception of the Bible, all books were prohibited; radio, television, and telephones were forbidden, and no holidays were observed. Even eyeglasses were on the list of prohibitions.

In the fall of 1999, a former member of the group contacted the Seekonk police department to express concern that one of the children might have been starved to the point of severe illness or death.[3] That expression of concern prompted an investigation by the Seekonk and Attleboro police departments.

---

[2]The mother filed no appeal.

[3]At one time, at least some members of the group lived in a house in Seekonk.

Ultimately the investigators learned that a young member of the group had likely died of starvation and that one of the father and the mother's children, Frederick,[4] had been stillborn. The investigators also ultimately learned that group members had buried the decedents' bodies in a location or locations that the father, the mother, and other members of the group declined to disclose.

Upon learning of the stillbirth and possible death, DSS filed a petition under G. L. c. 119, § 24, in the Bristol County Juvenile Court alleging that Fran, Sally, and Jane, and the other children living with the group, were in need of care and protection. As stated, the court issued an emergency order awarding DSS temporary custody of all the group's children. Following a "seventy-two hour hearing," see *ibid.*, the court ordered that DSS retain custody of the children. Thereafter, the court appointed an investigator and a guardian ad litem, both of whom filed extensive reports. Although DSS initially had been focused on reunification, the agency notified all parties on January 31, 2000, that it intended to seek a decree dispensing with the father and the mother's consent to their children's adoption. A trial took place on August 16, 2000, and, as also stated, produced the decrees from which the father appeals.[5]

On each of the five occasions that the father and mother appeared in court in connection with some aspect of the proceeding, the judge offered to appoint counsel to represent them or to act as "standby" counsel to assist them. On each such occasion, the judge carefully inquired about their desire for an appointed attorney. On each such occasion, both the father and mother declined, stating that they wished to represent themselves.[6] Their self-representation persisted through trial where, among

[4]All members of the group, including the father, the mother, and their children, referred to the stillborn child by a proper name. We follow suit.

[5]The length of time between the initial petition and trial resulted from the judge's conscious decision to let some time pass so that the father and mother could work with DSS to demonstrate their fitness to parent the children.

[6]They said the same thing to the attorney the court had tentatively designated to represent them. On one occasion during the emergency hearing, in response to the judge's invitation to explain why he was declining the offer of representation, the father explained that, "I believe in the Lord Jesus Christ, and He is my counselor."

other things, they made no objection to any of the testimony or to any of the twenty-eight exhibits there introduced.[7]

At trial's end, the judge announced from the bench his conclusion that Fran, Sally, and Jane were in need of care and protection, that the father and mother's parental rights were terminated, and that the DSS plan calling for the children's adoption by their paternal aunt should be implemented forthwith. Subsequently, the trial judge filed an extensive set of findings and conclusions spelling out the reasons for his decision.

*Challenged findings.* On this appeal, the father first claims that the trial judge's subsidiary findings in four discrete areas were unsupported by a preponderance of the evidence and that the evidence as a whole failed to demonstrate his current parental unfitness clearly and convincingly. As explained in numerous prior cases, "[i]n order to grant a petition to dispense with parental consent to adoption pursuant to G. L. c. 210, § 3, due process requires that the judge must find by clear and convincing evidence, . . . based on subsidiary findings proved by at least a fair preponderance of evidence, . . . that a parent is currently unfit to provide for the welfare and best interests of the child. . . . We do not disturb the judge's findings absent a showing that they are clearly erroneous." *Adoption of Don*, 435 Mass. 158, 164-165 (2001). Accord *Adoption of Gregory*, 434 Mass 117, 126 (2001). With that standard in mind, we approach each of the areas the father disputes.

The first of the four areas involves the death of one young group member whom we shall call Phillip. It is not entirely

---

[7]Those exhibits were filled with hearsay and much of that hearsay formed a basis for the judge's subsidiary findings. The father does not now claim, however, that, given the evidentiary rules applicable to those exhibits, any of the hearsay would likely have been excluded had the father been represented by counsel. See generally *Adoption of Georgia*, 433 Mass. 62, 68-69 (2000); *Custody of Michel*, 28 Mass. App. Ct. 260, 266 (1990). He does maintain, however, that we should "revisit" the permissibility of parental waiver of counsel in child welfare cases. See *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 4 & n.4 (1979); *Adoption of William*, 38 Mass. App. Ct. 661, 663-664 & n.3 (1995). We decline to do so.

clear from the record precisely when Phillip was born,[8] but he appears to have been between one and one and one-half years of age in March of 1999. In any event, on abundant evidence, the judge found that Phillip's mother was pregnant with another child in the spring of 1999. Sometime in March, another member of the group who had achieved a leadership role announced that she had had a vision instructing her that Phillip, who appears to have been a healthy youngster, should no longer eat solid food and instead should be fed water and his mother's breast milk alone. In addition, according to the vision, the mother should nurture herself by drinking a gallon of almond milk, i.e., a liquid made from pressed almonds, each day. Phillip's mother followed those instructions. She was unable, however, to produce enough nutrient for Phillip. Although she realized that her milk was not sustaining him, with the group's encouragement and counseling, she elected not to feed him any solid foods. No other member of the group fed Phillip either. As a consequence, over a period of several weeks he visibly weakened, withered, and eventually died.

The father does not challenge the judge's findings regarding the manner in which Phillip died. Instead, he claims that the judge had no basis for attributing to him any responsibility for Phillip's death. In that regard, he claims that he cannot be viewed as acting in loco parentis to Phillip within the principles set out in *Commonwealth* v. *O'Connor*, 407 Mass. 663, 668 (1990) ("[t]he key factors to a threshold showing of in loco parentis status are the intent to take over the position of parent, and the discharge of support and maintenance responsibilities toward the child"), cannot be held responsible merely because of his association with Phillip's parents, and cannot be held responsible simply because his religious beliefs were consistent with the beliefs of those actually responsible for Phillip's starvation.

The father's challenge, however, overlooks the abundant evidence in the record from which the judge could find that the group shared responsibility for, and knowledge of, the activities and behavior of all of the group's children. The children ate

---

[8]Members of the group typically did not obtain birth certificates when a new child was born.

communally, received care communally, and were disciplined communally. Although the evidence permits a finding that the father and his family lived in Seekonk when Phillip died and that Phillip and his family lived at the time in the Attleboro house where authorities encountered them in the fall of 1999, Fran told police that the children's "playroom" was in the Attleboro house. She also told police that, after Phillip's death, his body was placed in a basket, a trash bag was placed over the basket and he was put in the corner of a "bulkhead" next to the playroom.[9] Fran thus exhibited first-hand knowledge of what had happened to Phillip. That evidence warranted an inference that the father knew contemporaneously about Phillip's deterioration and death and the circumstances that produced both. Indeed, the judge would have been warranted in concluding that the father was one of Phillip's caretakers. See 110 Code Mass. Regs. § 2.00 (1996).[10] Caretaker or not, however, it was surely permissible for the judge to include as a factor in his over-all assessment of the father's parental fitness evidence suggesting that the father was in a position to intervene, or cause others to intervene, in a way that might well have saved young Phillip's life but declined to do so.[11] See generally, e.g., Restatement (Second) of Torts § 302(b) & comment c, § 302A, § 314 & comment d (1995).

The father next challenges the judge's findings regarding physical abuse of Fran, Sally, and Jane. Once again, however,

[9]Subsequently, she said, the area in the vicinity of the bulkhead "smelled" and was "stinky" and was covered with "tons" of flies and spiders.

[10]"Caretaker means . . . (d) any household member entrusted with the responsibility for a child's health or welfare[; and] (e) any other person entrusted with the responsibility for a child's health or welfare whether in the child's home, a relative's home, a school setting, a day care setting (including babysitting), a foster home, a group care facility, or any other comparable setting. As such 'caretaker' includes (but is not limited to) school teachers, babysitters, school bus drivers, camp counselors, etc. The 'caretaker' definition is meant to be construed broadly and inclusively to encompass any person who is, at the time in question, entrusted with a degree of responsibility for the child. This specifically includes a caretaker who is him/herself a child (i.e. a babysitter under age 18)."

[11]The weight of that evidence increases when considered in the context of the father's statement that he would not seek medical attention for his children even if medical attention were necessary to save them from a life-threatening situation. See *infra* at 461.

there was abundant evidence from which the judge could conclude that all three children had been spanked with a wooden paddle to the extent that the skin on their buttocks was thickened and calloused.[12] There was also evidence that the mother routinely wore around her waist a wooden paddle she used for spanking. Finally, there was evidence that spanking, with a paddle and otherwise, played a dominant role in the children's toilet training, that the father himself spanked Jane as part of her toilet training, and that, on many occasions, Jane exhibited great concern and worry when she was about to have an "accident" in her diapers. The findings with respect to physical abuse were warranted by the evidence.

The father's third challenge focuses on findings dealing with medical neglect. That challenge has two subparts. First, the father asserts that the children were in good health at the time they were removed from his care and custody. Apart from the thickened skin observed on their buttocks, that is true. The children, however, had never seen a physician and had not been vaccinated. More important, the father early on told a DSS investigator that he and the mother would not procure medical attention for their children even if the children were faced with a life-threatening illness. The father's passive behavior while Phillip starved to death bears stark witness to the truth of his professions. So too does his behavior with respect to Frederick, his stillborn child.

The judge found that Frederick had been born alive and that he would likely have survived if the father and mother had provided him adequate medical care. Those findings form the second prong of the father's attack on the findings concerning medical neglect. The findings that Frederick was born alive and then died in fact are unsupported by the evidence. But the judge's other findings regarding Frederick, and the abundant evidence supporting them, make powerful statements about the father's approach to his children's medical care.

When the mother went into labor with Frederick, she elected to give birth at home. Although midwives had been present to

---

[12]The father's suggestion that no one was actually able to find any evidence of excessive spanking on Jane's buttocks overlooks the personal observations of Dr. Bernard, a pediatrician, and those of Jane's first foster mother.

attend the birth of other children in the group's home, no midwife was called to attend at Frederick's arrival. Unfortunately, Frederick was in the breech position, something about which no member of the group apparently knew because, so far as the record reflects, the mother had received no prenatal care of any kind. Ultimately, Frederick became stuck in the birth canal with his umbilical cord wrapped around one foot. Although pink at some point during the birth process, Frederick never drew a breath after delivery. He was wrapped and placed behind the same bulkhead near the Attleboro playroom where Phillip had been placed after he starved to death. Neither the father nor the mother notified any health care or other authorities of Frederick's death. When first contacted by police and DSS investigators, the father acknowledged that Frederick had been stillborn but at all times before the trial refused to disclose the whereabouts of his body.[13] Overall, that evidence provided an ample basis on which to find that the children had, and were likely to continue to have, deficient medical care. "Courts need not wait until they are confronted with a maltreated child before deciding that care and protection are necessary." *Custody of Two Minors*, 396 Mass. 610, 620 (1986). See *Adoption of Mario*, 43 Mass. App. Ct. 767, 772 n.10 (1997).

The father's final attack on the findings challenges the judge's conclusion that the father abandoned the children after their emergency placement in foster homes. The father maintains that, far from abandoning the children, he always manifested an interest in reunification with them, but declined to see or communicate with them while they were in foster care because he believed it would not be in their best interests for him to do so. At various court proceedings, the father did express a desire for reunification and, to the extent that "abandonment" connotes a complete lack of interest in the children, see *Adoption of Astrid*, 45 Mass. App. Ct. 538, 544 (1998); G. L. c. 210, § 3(*c*), the evidence perhaps does not support the judge's finding. Even if not abandoned in law, however, the evidence amply supports a

---

[13]Group children other than Fran, Sally, and Jane told DSS caseworkers that group members ultimately took the bodies of Frederick and Phillip to Maine. In Maine, the children said, children carried boxes containing the bodies to and from a number of potential burial sites until a satisfactory site was found, and the bodies were interred.

conclusion that the children were abandoned in fact and provides further evidence of the father and mother's unfitness.

The children were in foster homes for ten months between the time they left the father and mother's care and the time of trial. Initially, while focusing on reunification of the family, DSS arranged many opportunities for supervised visitation between the father, the mother, and the children. It continued to do so even after changing its focus to adoption. The father and mother, however, refused to take part in any visitation whatsoever. Moreover, they refused to send any communications to their children. They persisted in their refusal even when, at a January 19, 2000, hearing, the children's lawyer told the judge that the children wanted their parents to visit them. The father responded to the children's request by telling the judge, in effect, that he would not engage in visitation because he knew what was best for the children. Moreover, according to the children, the father instructed them not to communicate with him or the mother and not to send them pictures because pictures and other written communications would be like using the telephone and telephone use was forbidden.

Benevolent abandonment, if benevolent it was, is abandonment nonetheless.[14] Suddenly terminating all communications with the children, instructing them to have no contact with him, and refusing to have contact notwithstanding the children's relayed entreaties for contact were facts from which the judge was warranted in drawing inferences adverse to the father's parental fitness.

The judge's subsidiary findings, those discussed above and others the father does not challenge, provided more than sufficient support for his ultimate finding that DSS had shown by clear and convincing evidence the father's unfitness at the time of trial to parent the three girls. Indeed, support for such a conclusion probably exists in a record stripped of all the challenged findings. That record would include findings and

---

[14]By the time of trial, the father, apparently along with other members of the group, had been jailed for contempt of court. The father does not suggest, however, that his custodial status interfered with his ability to communicate with the children, nor does he suggest that he had been in custody for the bulk of the period during which DSS was urging supervised visitation.

evidence regarding a bizarre trip to Maine the father, the mother, the three girls, and other group members took in the spring of 1998, a trip that seriously endangered the children's health and welfare, and included the group's initial reliance on faith and prayer to deal with a backed-up septic system that was flooding the basement of the dwelling where they lived with their children, the severe malnourishment of another group youngster, and the temporary disposition of Frederick's and Phillip's bodies behind a basement bulkhead near the playroom where all the children played.

*"Profile" testimony.* In addition to challenging the findings just discussed, the father challenges what he describes as "profiling" testimony presented to the court by Robert Pardon, whom the court appointed as Fran, Sally, and Jane's guardian ad litem and the guardian ad litem for the children of other group members. The judge selected Pardon because, in the judge's words, Pardon was "a nationally recognized expert in the fields of [s]tudy and [r]esearch of cults and how they develop, their inner workings and teachings, and their effect on children born into cults and exposed to cults as they grow up."

Pardon submitted to the court an extensive report dealing not only with the specific behaviors in which group members engaged and the impact of those behaviors on the children who were his wards, but also on the typical behavior of groups, or cults, Pardon found similar to the father's group. The father asserts that the report's description of typical cult behavior and the relationship between typical behavior and the behavior of his group amounts to impermissible profiling evidence. We disagree.

Prohibited profiling evidence is evidence to the effect that an individual's possession of a certain set of characteristics creates a likelihood that the individual committed a specific crime or engaged in a specific act. See *Commonwealth* v. *Day*, 409 Mass. 719, 724-726 (1991); *Custody of Eleanor*, 414 Mass. 795, 801 (1993); *Commonwealth* v. *Munera*, 31 Mass. App. Ct. 380, 384-385 (1991); *Commonwealth* v. *LaCaprucia*, 41 Mass. App. Ct. 496, 498-499 (1996); *Commonwealth* v. *Frias*, 47 Mass. App. Ct. 293, 296 (1999); *Adoption of Keefe*, 49 Mass. App. Ct. 818, 823-824 (2000). Such testimony is forbidden for a variety of

reasons, not the least of which is the logical fallacy inherent in attempting to use general group characteristics to determine whether a specific individual in fact engaged in a specific, discrete act at some point in the past. See Nesson, Agent Orange Meets the Blue Bus: Fact Finding at the Frontier of Knowledge, 66 B.U. L. Rev. 521, 530-535 (1986).

In this case, Pardon's report did no such thing. True, he characterized the father's group as a "totalistic, destructive group" and discussed how the group exhibited eight characteristics that were, in his opinion, common to such groups. But he did not "reason" from general characteristics to a conclusion that specific acts had occurred. Instead, in much the same way as a physician proceeds from symptoms to diagnosis, Pardon used facts about behavior of group members to reach conclusions about the group's nature and likely future course. His report thus provided a mechanism for attempting to understand the otherwise inexplicable, see generally *Commonwealth* v. *Dockham*, 405 Mass. 618, 629-630 (1989); *Commonwealth* v. *Mamay*, 407 Mass. 412, 421-422 (1990); *Commonwealth* v. *Goetzendanner*, 42 Mass. App. Ct. 637, 643-644 (1997), and a basis for determining whether the girls' best interests would be served if they remained with their parents while the latter moved with the group into a future the report predicted.[15]

*Chilled testimony.* Finally, the father asserts that his right to

---

[15]That is not to say that Pardon's appointment and report were free from difficulties. Two in particular merit comment. First, although DSS stated at oral argument that it is a common practice in cases like this to appoint a guardian ad litem (GAL) who has expertise in a particular area of concern about parental fitness, that practice can conflate the expert's role as an assessor of parental behavior and his or her role as a thoughtful investigator of the children's best interests. At least in cases like this where the expert's testimony is likely to play a critical role in the court's ultimate decision about parental behavior, and not simply about the impact of that behavior on the children, it would be far better to appoint an independent GAL who could make assessments about the children's best interests in a manner that took account of the expert's opinions but was not inextricably bound to them. Second, when the judge appointed Pardon as the GAL, the judge told the father that "although it's not necessary I tell you . . . I think you'll feel more comfortable in knowing that my experience with [him] is that he is an extremely religious individual who has a deep faith in God and I think that's important because I know how you folks feel, as do I." At other points during the proceedings, the judge told the father and other members of the group that he, himself, was a religious man and, on at least two occasions when the father said that he needed no assistance from lawyers

testify was impermissibly chilled when the judge told him that his failure to take an oath meant that, in the judge's view, he would not be telling the judge the truth.[16] It would have been

---

because the Lord was his counselor, the judge said that God or the Lord was his counselor, too. Finally, in his factual finding, the judge adopted Pardon's findings that the group had engaged in "scripture twisting," i.e., ascribing "erroneous" meanings to Bible passages and then acting in accordance with those meanings. Although the father bases no claim of error on the judge's remarks or findings regarding "scripture twisting" and although it appears as if the judge were simply trying to establish a rapport with the father by revealing his own religious orientation, it is important to note that the State and Federal Constitutions remove all matters of religious doctrine from the jurisdiction of secular officials. See First Amendment to the United States Constitution; art. 2 of the Massachusetts Declaration of Rights. Those constitutional provisions thus prohibit our courts from making judgments about the "true" meaning of scripture, see *Madsen* v. *Erwin*, 395 Mass. 715, 722 (1985) ("[c]ourts cannot question the verity of religious doctrines or beliefs"), and leave no room for the injection of a judge's religious sentiments into the discharge of his or her official functions. See generally, e.g., *Murphy* v. *I.S.K. Con. of New England, Inc.*, 409 Mass. 842, 855 (1991); *Commonwealth* v. *Twitchell*, 416 Mass. 114, 130 n.17 (1993); *Martin* v. *Corporation of Presiding Bishop of Church of Jesus Christ of the Latter Day Saints*, 434 Mass. 141, 152 (2001). The judge should not have made the cited remarks.

[16]The judge made that statement during the colloquy, held after DSS had finished its case in chief, which proceeded as follows:

JUDGE: "Sir, do you intend to present any evidence or testify in your own behalf or call any witnesses?"

FATHER: "I'd like to [inaudible] just a few things in my own behalf, your honor."

JUDGE: "All right, the Clerk will swear you in."

FATHER: "I cannot swear in, Your Honor."

JUDGE: "Pardon me?"

FATHER: "I cannot swear in, Your Honor. I will not take an oath."

JUDGE: "Well you understand, then, the Court cannot give necessarily the weight to your testimony that it would to somebody who affirms or swears —"

FATHER: "That's fine, Your Honor."

JUDGE: "— to tell the truth?"

FATHER: "I understand that."

JUDGE: "You understand that?"

FATHER: "The Bible speaks. My yes will be my yes and my no will be no."

JUDGE: "All right, sir. Madam Court Officer, is it possible the witness could come up to the witness stand? You understand I'm accepting your testimony not under oath, sir?"

FATHER: "I understand that, Your Honor."

Adoption of Fran.

better if the judge had explained more fully the father's option to affirm instead of taking the traditional oath. See G. L. c. 233, § 18. Although taking that oath is the customary method for signifying one's recognition that consequences attend purposeful falsehood, it is not the only method for doing so. The law requires some affirmative representation that the witness recognizes his or her obligation to tell the truth. See G. L. c. 233, §§ 17-19.[17]

For two reasons, however, we are unpersuaded that any error in the manner which the judge handled the oath requires reversal. First, in response to an invitation the judge made immediately after the colloquy set out in the margin, see note 16, *supra*, the father gave the judge his views about the issues on which he believed the trial centered and told the judge that he, and the other group members, stood firm on what they believed and were "willing to stand and take whatever comes our way based on what our God brings us." He continued by saying that God knew the truth and that Pardon's report contained "half-

JUDGE: "It may or may not carry the same weight as the testimony of somebody who testifies under oath?"

FATHER: "I understand that, Your Honor."

JUDGE: "And in doing so, you are telling me that I'm not necessarily telling you the truth. You understand that?"

FATHER: "No, Your Honor, that's not exactly what I'm saying."

JUDGE: "Well, that's the way I'm taking it."

FATHER: "Well, then I don't have anything to say, Your Honor."

JUDGE: "Well, you can testify without taking an oath; I just want to understand that. But I want you to understand the ramifications of it."

FATHER: "I have nothing, Your Honor [inaudible]."

[17]With children, recognition of that obligation sometimes is more effectively obtained through careful questioning of the child than through recitation of what to the child may be a meaningless oath or affirmation. See *Commonwealth* v. *Brusgulis*, 398 Mass. 325, 329-332 (1986); *Commonwealth* v. *Monzon*, 51 Mass. App. Ct. 245, 250-253 (2001). With competent adults, however, there is generally no reason that the judge should be required to depart from customary practices to engage in some particularized discussion with a witness regarding the contours of the witness's commitment to tell the truth. On the contrary, the witness is obliged to tell the truth, the whole truth, and nothing but the truth. That obligation should have no fuzzy edges.

truths and half lies." He returned to the same theme in the brief closing summation he ultimately made when the judge invited him to do so. Inferentially, at least, that is what the father would have said had he testified, and thus the judge had the benefit of it.

Second, the judge had good reason to discount anything the father had to say unless the father affirmatively recognized that his testimony was subject to the laws generally applicable in the courts throughout the Commonwealth and, indeed, throughout the land. By the time of the trial, the father repeatedly had demonstrated that his value system, his beliefs, and his actions were substantially dictated by considerations divorced from the laws, physical and legal, governing the rest of society. While those demonstrations did not necessarily predict conscious mendacity on his part, the judge could hardly be faulted for ascribing a low probative value to what the father had to say, at least in the absence of the father's unnuanced, straightforward recognition that he had the same obligation to tell the same kind of unadorned truth the law imposes on other witnesses. If telling the father so chilled the father's willingness to testify, it did not do so impermissibly.

*Decrees affirmed.*