## IN THE MATTER OF A CARE AND PROTECTION SUMMONS
### (and a companion case).

Bristol. May 9, 2002. - June 26, 2002.

Present: MARSHALL, C.J., GREANEY, SPINA, SOSMAN, & CORDY, JJ.

*Jurisdiction,* Care and protection of minor. *Adoption,* Care and protection. *Parent and Child,* Care and protection of minor. *Contempt. Constitutional Law,* Self-incrimination. *Judge. Practice, Civil,* Disqualification of judge.

In a care and protection proceeding under G. L. c. 119, § 24, the Department of Social Services met its burden of proving by a fair preponderance of the evidence the existence of a child under the age of eighteen years, and the judge's findings to the effect that a live child had been born were not clearly erroneous. [234-236]

In a care and protection proceeding under G. L. c. 119, § 24, in which the parents refused to comply with summonses to bring their infant to court, claiming that the mother had suffered a miscarriage and that there was no child to bring before the judge for identification, the judge had authority under § 24 to order the parents to present their child for identification and, in the face of the parents' noncompliance with the order and failure to meet their burden of proving that it was impossible to comply with the order, the judge could enforce his order by finding the parents in civil contempt [236-237]; further, the judge's statement that the parents could purge the contempt by disclosing the location of the child's remains did not, in the circumstances, violate the parents' constitutional rights against self-incrimination [237-239].

The judge in a care and protection proceeding did not abuse his discretion in declining to recuse himself, notwithstanding an earlier involvement with the parents, where the parents delayed their recusal request until the proceedings were well underway, suggesting a tactical decision in the face of an adverse ruling, and where the parents failed to show that any alleged bias of the judge stemmed from an extrajudicial source. [239-240]

In a care and protection proceeding, any possibility of the judge's drawing an improper inference from the parents' failure to take an oath was insignificant in light of sufficient other reasons to disbelieve their testimony. [240]

PETITION filed in the Bristol County Division of the Juvenile Court Department on January 4, 2002.

Judgments of contempt were ordered by *Kenneth P. Nasif,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*J.W. Carney, Jr. (Andrew M. D'Angelo & Kathleen O'Connell* with him) for the parents.

*Virginia A. Peel,* Special Assistant Attorney General, for Department of Social Services.

*David A.F. Lewis* for the child.

MARSHALL, C.J. At issue in this appeal are two judgments of civil contempt entered by a judge in the Juvenile Court Department attendant in a care and protection proceeding. The Department of Social Services (department) sought temporary custody of a newborn infant of the mother and father, the appellants in this case. See G. L. c. 119, § 24. The parents refused to comply with summonses to bring their infant to court claiming, in circumstances we shall describe, that the mother had suffered a miscarriage and that there was no child to bring before the judge for identification.[1] After evidentiary hearings the judge found that the mother had given birth to a child and ordered the parents to produce the child. When they refused to do so, the judge found the parents in civil contempt and ordered them held at a house of correction. The judge also indicated that the parents could purge themselves of contempt by informing him of the location of the infant's alleged remains.

On appeal the parents claim that they cannot comply with the order underlying the contempt because there is no child to present for identification, and that ordering them to divulge the location of its remains violates their rights against self-incrimination under the United States and Massachusetts Constitutions. They also claim that the judge was not impartial and should have recused himself from these proceedings. We affirm the contempt judgments, and conclude that there was no reason for the judge to recuse himself.

I

The central issue in these consolidated appeals concerns orders entered on January 17, 2002, and February 8, 2002, by a Juvenile Court judge holding the parents in contempt for their

---

[1]General Laws c. 119, § 26, which sets forth the procedures in a care and protection case requires that a child be "identified by the court" before the judge hears evidence that the child be committed to the custody of the department.

refusal to make their newborn infant available to the court for "identification." See G. L. c. 119, §§ 24, 26.[2] A series of related judgments and orders have been entered by the judge, by a single justice of the Appeals Court, and by a single justice of this court. The parents have taken appeals from some, but not all, of those orders, and a single justice of the Appeals Court consolidated those appeals.[3] We transferred the consolidated cases here on our own motion.

To place the parents' claims in context, we describe in some detail the procedural history. The proceedings began on January 4, 2002, when the department filed a care and protection petition alleging that a newborn infant, the sixth child born of the father and mother, was in need of care and protection. See G. L. c. 119, § 24. The 2002 petition was the third care and protec-

[2]General Laws c. 119, § 24, provides in pertinent part:

"The divisions of the juvenile court department, upon the petition under oath of a person alleging on behalf of a child under the age of 18 within the jurisdiction of the court that the child: (a) is without necessary and proper physical or educational care and discipline; (b) is growing up under conditions or circumstances damaging to the child's sound character development; (c) lacks proper attention of the parent, guardian with care and custody or custodian; or (d) has a parent, guardian or custodian who is unwilling, incompetent or unavailable to provide any such care, discipline or attention, may issue a precept to bring the child before the court, shall issue a notice to the department and summonses to both parents of the child to show cause why the child should not be committed to the custody of the department or that any other appropriate order should not be made."

[3]The mother and father appealed from the judgments of contempt entered on January 17, 2002, and the decision of a single justice of the Appeals Court denying their request to stay the Juvenile Court judge's orders pending their appeal. Other than requesting a stay, the parents have not challenged the sanction of incarceration under the contempt judgments. In her denial of the parents' motion for reconsideration of their request for a stay, the single justice consolidated the appeal from the two contempt judgments with the appeal from her denial of the stay request. There is no indication on the docket or elsewhere in the record that the parents filed a separate appeal from her denial of the motion for reconsideration. The parents also did not take an appeal from the denial of relief under G. L. c. 211, § 3, by the single justice of this court.

As to the parents' appeal from the denial of their request for a stay, the parents have failed to include in the record appendix any relevant record material. They also do not raise here any issue concerning the denials of their request for a stay. The issue is therefore waived. See *King* v. *Driscoll*, 418 Mass. 576, 585 n.8 (1994), *S.C.*, 424 Mass. 1 (1996); Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

tion petition filed by the department concerning these parents. As a result of two prior petitions, the parents have been found unfit, their other children have been placed in the custody of the department, and their parental rights as to those children have been terminated.[4] See G. L. c. 119, § 24; G. L. c. 210, § 3. Based on the affidavit of a department social worker, on January 4, 2002, the judge found reasonable cause to believe that the newborn infant's welfare was at risk, and he awarded temporary custody of the baby to the department. He issued a precept for the child[5] and issued summonses to the mother and father for a hearing on temporary custody, known as a "seventy-two hour hearing," which he scheduled for January 8, 2002. See G. L. c. 119, § 24.[6] The summonses ordered the parents to bring their infant to the hearing.

On January 8, and again on January 15, the parents appeared with counsel for the evidentiary hearing, but they did not bring their child. Six witnesses for the department testified.[7] The department also called the parents as witnesses, but they refused

---

[4]Only the father appealed from the final judgment in the first case, which involved the parents' three oldest children. The decrees were affirmed on appeal. See *Adoption of Fran*, 54 Mass. App. Ct. 455 (2002). A fourth child of the parents died during a breech birth. The judge found that the death could have been prevented had the parents or other members of the group where the parents lived provided some minimal medical assistance to the child. *Id.* at 461-462. Both parents appealed from the final judgment of the second case involving their fifth child, although the mother did so after this present action was commenced. The judgment in the second case remains pending on appeal.

[5]A precept is an order granting authority to State officials, such as the department, to bring a child before the court or to remand the child to the custody of another person or entity. See G. L. c. 119, §§ 24, 26 (2).

[6]General Laws c. 119, § 24, requires that an emergency order transferring custody of the child "shall be for a period not exceeding 72 hours except that upon the entry of the order, notice shall be given to either or both parents, guardian with care and custody or other custodian to appear before the court. The court shall, at that time, determine whether temporary custody shall continue until a hearing on the merits of the petition for care and protection is concluded before the court."

[7]The department presented testimony from a neighbor of the parents, a program manager and an investigator with the department, an investigator with the district attorney's office, and two police officers with the Attleboro police department. The department also called two members of the communal religious group to which the parents belong, both of whom invoked the privilege against self-incrimination and refused to testify.

to testify, claiming they had a right not to incriminate themselves under the Federal and Massachusetts Constitutions.[8] Neither the parents nor their attorney so much as hinted that the mother had suffered a miscarriage, nor did they offer any evidence that their infant was no longer alive. The basis of their claim of privilege, see note 8, *supra*, was also inconsistent with any suggestion that the child was no longer alive.

At the conclusion of the hearing, the judge issued findings of fact to the effect that the mother had been pregnant during the late summer or early fall of 2001, that, as of January 4, 2002, she was no longer pregnant, that she had given birth to a child, that the parents either had custody of the child or the ability to present the child, and that the parents had wilfully refused to bring the child to court for "identification" as required by the summons and G. L. c. 119, § 26. The parents were notified that, if they failed to present the child or disclose its whereabouts by January 17, they would be held in civil contempt.[9]

On January 17, the parents again appeared before the judge, this time to respond to the complaints for civil contempt. They did not bring their infant with them and, when called as witnesses by the department, again claimed a right not to testify, and refused to disclose the infant's whereabouts. There was again no suggestion by the parents or their counsel that the mother had miscarried. The judge then issued a judgment of civil contempt and order against each parent for refusing "to present the child for identification."[10] He ordered the parents held at the house of correction until January 31, 2002, at which

---

[8]Their attorney explained to the judge: "The [d]epartment is alleging that this child is in immediate danger of suffering serious physical harm at the hands of the parents. If such harm ever did befall this child, [the father] cannot be compelled to provide evidence that would support a criminal prosecution in that regard." In their memorandum in support of their January 17 petition to a single justice of the Appeals Court for a stay of the contempt judgments pending appeal, the parents cited as the basis for the privilege G. L. c. 265, § 13J, which makes assault and battery on a child a criminal offense. See note 20, *infra*.

[9]Compliance with court orders may be enforced through a separate "civil contempt proceeding," with its own summons, complaint, and potential evidentiary hearing. See Mass. R. Civ. P. 65.3, as appearing in 386 Mass. 1244 (1982).

[10]The judge found that the parents "have wilfully refused to bring said subject child to Court for 'identification' as mandated by [G. L. c. 119, §§ 24-

time they would be brought before the court and allowed an opportunity to purge the contempt by complying with his orders. At the request of the parents, the judge stayed his orders "for three business days" to permit them to seek a stay in the Appeals Court.

On January 18, 2002, the parents filed a motion with a single justice of the Appeals Court for a stay of the orders pending their appeal from the contempt judgments. See Mass. R. A. P. 6, as amended, 378 Mass. 930 (1979). On January 23, 2002, the single justice denied their request, and the parents filed a notice of appeal from her decision.[11] The following day, the parents sought relief from a single justice of this court, a stay pending appeal from the Appeals Court single justice's order.[12] See G. L. c. 211, § 3. On January 24, 2002, the single justice of this court stayed the contempt judgments and incarceration orders pending his further order. On February 4, after a hearing, he denied the parents' petition and vacated his existing stay.

That same day, the Juvenile Court judge ordered the parents to appear before him the following morning. The father and mother did so, and indicated a willingness to purge themselves of the contempt. For the first time in these proceedings, the parents' attorney informed the judge that the parents would testify that the mother had suffered a miscarriage. The judge thereupon reopened the seventy-two hour hearing to receive evidence. Each parent then testified that the mother had been

26], in violation of the Law and the Order of this Court." The summons issued to each parent on January 4, had ordered them "to bring the child(ren) with you when you come to court on the above date and at the above time." At the close of the January 15 hearing, the judge again ordered the parents to present the child, or to provide "direct information as to where that child is regardless of the condition of that child be it dead or alive."

[11]The single justice stayed her order until January 25, 2002, in order to allow the parents to seek review of her denial of their motion for a stay pending appeal. On January 24, 2002, the parents filed a petition in the Appeals Court to stay the decision of the single justice pending their appeal from her decision. The petition was denied the same day.

[12]The parents moved "for a stay pending appeal of the Single Justice of the Appeals Court . . . order finding them in contempt." In fact the single justice of the Appeals Court did not find the parents in contempt; she denied their motion for a stay of the Juvenile Court judge's orders pending their appeal from the contempt judgments. The single justice of this court accordingly considered their claim as a petition seeking relief from that denial.

pregnant, and that the pregnancy had ended in a miscarriage. We will later summarize in greater detail the substance of their testimony. Based on their claim that the child was stillborn, the parents moved to dismiss the care and protection petition for lack of jurisdiction. They also requested, for the first time, that the judge recuse himself due to a claimed lack of impartiality. The judge denied both requests. He concluded that, notwithstanding the testimony of the parents, there was no basis on which to vacate his earlier finding that the mother had given birth to a child who may be in need of care and protection. The parents were thereupon committed to a house of correction.

On February 8, the judge issued a further judgment of civil contempt and order against both the mother and father for their failure to present their infant for identification. He added that the parents could purge the contempt either by producing the child or, "in the alternative, [by] satisfy[ing] the reasonable concerns of this Court and the authorities by providing sufficient evidence that no child exists by identifying the location of the alleged burial site."[13]

Meanwhile, on February 5, the parents had filed a motion before the single justice of the Appeals Court, asking her, in light of their testimony of a miscarriage, to reconsider her order

[13]Subsequent to February 8, the parents have been before the judge on three occasions. At a hearing on February 14, they again refused to present the child for identification or to divulge the location of any remains. The judge thereupon issued a further judgment holding the mother and father in contempt. The parents filed a motion for temporary furlough for humanitarian purposes on March 12, which was allowed. At a subsequent hearing on March 14, 2002, the parents again failed to present the child. They were held in contempt and committed to a house of correction.

On June 18, 2002, the judge once again adjudicated the parents in contempt. However, on that day, he released them from further incarceration, explaining that the Bristol County district attorney had empaneled a special grand jury "to investigate the matter of the missing . . . child together with any other ancillary issues possibly including obstruction of justice, perjury, and any other related matters." The judge determined that the grand jury had "more than adequate tools at their disposal to utilize in dealing with these issues, as opposed to the limited sanctions this Court can impose." He continued the contempt judgments "until such time as the special grand jury concludes its investigation into these matters." The contempt judgments issued on February 14, March 14, and June 18 are not at issue here. See note 14, *infra*.

denying their request for a stay pending appeal. After a hearing, the single justice denied the motion on March 1. On her own motion, she consolidated the appeal from the initial judgments of contempt with the appeal from her original order denying a stay, and docketed the case for briefing and oral argument before a panel of the Appeals Court.[14] See note 3, *supra.*

II

According to the findings of the judge, the parents are members of a "dangerous and destructive cult" known as "The Body."[15] They and the members of the communal group with whom they have lived reject many aspects of modern society, including medicine, school, government institutions, and society's laws and regulations. The members of the group share

[14]The parents filed their motion to reconsider before the judge issued his February 8 judgment of contempt. There is nothing in the record to indicate, nor do the parents claim, that they have appealed from that judgment. Nevertheless, we consider the February 8 judgment for several reasons. The single justice of the Appeals Court considered it in her denial of the parents' motion for reconsideration, and it is apparent from her order consolidating the parents' appeals and docketing them before a panel of the Appeals Court that it was her intent that all of the materials before her be considered. In addition, "a decision on the merits should not be avoided on the technicality that a premature notice of appeal was or may have been filed, where no other party has been prejudiced by that fact." *Swampscott Educ. Ass'n* v. *Swampscott,* 391 Mass. 864, 865-866 (1984). The parties have fully briefed the issue, and the department has not claimed that it was prejudiced by the parents' premature filing of the motion to reconsider or by their failure to file a direct appeal from the February 8 judgment. Further, the judgment arises from a continuing refusal of the parents to comply with the judge's original order to present the child for identification, from which the parents have appealed. Were we to decline to consider the February 8 judgment, issued in light of the parents' testimony concerning a miscarriage during the "reopen[ed]" seventy-two hour hearing on February 5, we would soon be faced with the same issue in subsequent appeals from the continuing contempt judgments that the judge has issued. It is within our power to extend the time for filing a notice of appeal: the parents' right to file notice from the February 8 judgment has not necessarily expired. See Mass. R. A. P. 14 (b), as amended, 378 Mass. 939 (1979). Cf. *Commonwealth* v. *White,* 429 Mass. 258, 262-265 (1999). In the interests of judicial economy, we treat the February 8 judgment as if it were properly before the court.

[15]The department admitted in evidence (without objection) for limited "prognostic value in terms of a pattern of ongoing conduct" the findings in the first care and protection case concerning these parents.

responsibility for, and knowledge of, the activities and behavior of all of the group's children. The children of members of the group receive care communally, and are disciplined communally.

The parents' first involvement with the department began on November 5, 1999, when the department received a report, filed pursuant to G. L. c. 119, § 51A, alleging the abuse and neglect of a child living in the group.[16] Soon thereafter, § 51A reports were filed alleging the abuse and neglect of the parents' own three children. On September 14, 2000, the same judge who presided over the hearings in this case entered a judgment of parental unfitness, dispensing with the need to obtain parental consent for the children's adoption. See note 4, *supra*. After a second care and protection proceeding on September 12, 2001, with respect to the parents' fifth child, the parents' rights were similarly terminated. See note 4, *supra*. The present case concerns the parents' sixth child.

In reaching his decision in these proceedings, the judge expressly relied on his findings in the two prior care and protection proceedings. He referred to several examples of the detrimental impact of the group's actions on the well-being of their children, noting that on the basis of a "vision," a child in the group had been "deliberately starved to death" while "in the presence of, and in the care of, all the members of this cult including [the parents]." Members of the group, including these parents, had buried the child with the fourth and stillborn child of the parents in an unmarked grave in Maine.[17]

The judge considered the evidence presented in January, 2002, regarding the parents' sixth child, the subject of the challenged contempt orders, in the stark light cast by these earlier proceedings. The department here presented evidence that the mother was seen by several witnesses to be pregnant in mid-September and late October, 2001. Around Thanksgiving, 2001,

[16] It was ultimately learned that the child had died while in the care of the group. The child's parents (who are not the appellants in this case), as well as another member of the group, were later indicted on charges related to the child's death.

[17] The parents obtained immunity from prosecution for the deaths of the two children in exchange for leading authorities to their graves and agreeing to offer testimony at the time of the trial of others involved in the children's deaths.

a neighbor saw the mother, whom she believed to be in labor, being carried to a van by two men. The mother did not return for at least one or two weeks; she no longer appeared to be pregnant.

In the course of attempts to locate the newborn infant, investigators with the department, the district attorney's office, and the police attempted to interview the parents, but they refused to respond to inquiries. The investigators also went to the house of another cult member after learning that he had been seen several times with members of the group. They did not find the man at home, but, through a window, investigators saw a "free standing infant swing." No child was known to reside at the house. Later that evening, the cult member refused to answer any of the investigators' questions.

The Attleboro police then obtained search warrants for the parents' house and the house of the cult member. Accompanied by the Attleboro police, the investigators returned to the cult member's house. The windows had been blocked with cardboard, and on entry, the investigators noticed that the swing had disappeared. The search of the parents' house revealed various articles suggesting the presence of an infant, including diapers, infant-sized clothes, and a portable crib.

On January 17, 2002, the judge found, by a fair preponderance of the evidence, that the mother had given birth to a child, the subject of the care and protection proceeding commenced by the department.

We turn now to the additional evidence offered by the parents when they returned to court on February 5, 2002. The mother testified that she did not know when she conceived the child. When she went into labor, she said, she did not know that her child was not alive, although in hindsight she remembered that she had not felt the child move for two days. She testified that she went into labor while at home, and that she and her husband then went to a friend's house where the miscarriage occurred. She did not see the fetus when she delivered, but claimed that it had died in her uterus, was decomposed, and had a strong odor. The father testified essentially to the same effect. Neither the mother nor the father was able to give even an approximate date of the miscarriage. The mother could not remember for

how long she was in labor, or at what time of day she had delivered. The father testified that he did not know whether the miscarried fetus had all of its limbs, fingers, or toes.

When cross-examined as to the location of fetal remains, the parents refused to answer and claimed a right against self-incrimination. The parents' attorney specified that the basis for their assertion of their privilege was possible charges of misdemeanor offenses for the improper burial of human remains.[18],[19] The parents offered no other evidence in support of their claim that the mother's pregnancy had ended in a miscarriage.

We now turn to the legal challenges to the orders of contempt.

### III

### A

The parents argue that the department failed to present even "a scintilla of evidence" that a live child was born to them, and therefore failed to present sufficient facts to support a care and protection petition. Focusing all but exclusively on the evidence adduced at the initial seventy-two hour hearing (January 8 and 15), the parents argue that the judge's finding to the effect that a live child was born was clearly erroneous.

---

[18]General Laws c. 114, § 43M, provides in part: "Except as otherwise provided by law, or in case of a dead body being rightfully carried through or removed from the commonwealth for the purpose of burial or disposition elsewhere, every dead body of a human being dying within the commonwealth, and the remains of any body after dissection therein, shall be decently buried, entombed in a mausoleum, vault or tomb or cremated within a reasonable time after death." General Laws c. 114, § 43N, makes failure to comply with the provisions of G. L. c. 114 "in respect to . . . the disposal of dead human bodies" a misdemeanor.

[19]The parents earlier had unsuccessfully argued before a single justice of the Appeals Court and a single justice of this court that the order to "produce" the child violated their rights against self-incrimination. Their arguments were denied on the basis of a United States Supreme Court opinion holding that the Fifth "Amendment's protections [are inapplicable where] the incrimination that may result from the contents or nature of the thing demanded . . . [and a parent] therefore cannot claim the privilege based upon anything that examination of the [child to be presented] might reveal." *Baltimore City Dep't of Social Servs. v. Bouknight*, 493 U.S. 549, 555 (1990). They do not press the argument here, and the issue is waived. See Mass. R. A. P. 16 (a) (4).

Jurisdiction in a care and protection action is of course premised on the existence of a child under the age of eighteen years within the jurisdiction of the court. G. L. c. 119, § 24. At the initial seventy-two hour hearing, the child must be "identified" by the court, G. L. c. 119, § 26, and here, as in every seventy-two hour hearing, the burden was on the department to prove by a fair preponderance of the evidence the existence of a child under the age of eighteen years. See *Care & Protection of Robert*, 408 Mass. 52, 68 (1990) (standard of proof in seventy-two hour hearing is "fair preponderance of the evidence"). We conclude that the department met its burden and that the judge's findings are not clearly erroneous. See *Custody of Eleanor*, 414 Mass. 795, 799 (1993), and cases cited.

We consider first the evidence at the initial seventy-two hour hearing. In making our determination, we give substantial deference to the judge's assessment of the weight of the evidence and the credibility of the witnesses. *Adoption of Larry*, 434 Mass. 456, 462 (2001). The judge was entitled to rely, as he did, on his findings in earlier proceedings involving these parents, and to assess their credibility in light of those proceedings. See note 15, *supra*. Cf. *Adoption of Diane*, 400 Mass. 196, 204 (1987) (judge may consider history of parental unfitness in determining current parental unfitness). The department presented evidence of the mother's pregnancy, and evidence consistent with the existence of a live child born to the parents. The parents did not claim at that time — and offered no evidence to suggest — that the mother had suffered a miscarriage. They refused to testify and invoked their privilege to avoid incrimination in any case concerning "some harm" or "some abuse" to the child, a position inconsistent with their later claim of a miscarriage.[20] See note 8, *supra*. It was perfectly permissible for the judge to draw inferences as to the existence of a child and the reasons why the parents might decline to present the child for identification. See *Custody of Two Minors*, 396 Mass. 610, 616 (1986). His finding on January 15, 2002, that the mother had given birth to a child who may be in need of care and protection is sound.

[20]Possible incrimination under G. L. c. 265, § 13J, making assault and battery on a child a criminal offense, presupposes the existence of a living child to whom the alleged "some harm" or "some abuse" occurs.

As to the parents' claim that their later testimony to the effect that the mother suffered a miscarriage mandated a dismissal of the care and protection petition, the judge was not required to credit their testimony. See *Care & Protection of Three Minors*, 392 Mass. 704, 711 (1984) (judge not obliged to believe mother's testimony or that of any other witness in care and protection proceedings). He was careful to explain why their testimony did not persuade him to vacate his earlier findings: it came only after the parents had exhausted their appeals on the order to produce the child, was vague, and was not supported by any corroborating evidence. It is apparent from the February 5 hearing that the judge thought the parents' assertion of a miscarriage was inconsistent with the position they had previously taken in January and pursued on appeal. As before, the judge was entitled to consider, as he did, the prior proceedings involving these parents, cf. *Adoption of Diane*, *supra* at 204, and was warranted in drawing a negative inference from the parents' unwillingness to testify about the location of the infant's alleged remains. See *Custody of Two Minors*, *supra*.[21] The judge was correct not to dismiss the care and protection petition.

B

The parents next challenge the contempt judgments themselves.[22] First, they claim that they cannot be held in contempt for noncompliance with the underlying orders because there is no child to present to the court. Second, they claim that the judge's statement that the parents could purge the contempt by disclosing the location of the child's remains violates their rights against self-incrimination under the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. We reject both arguments.

[21]The parents' argument that the judge impermissibly shifted the burden of proof from the department to them to prove the existence of a child is without merit. The judge did not require the parents affirmatively to disprove the existence of the child, and he did not base his contempt judgments on their failure to do so. Instead, he properly evaluated their testimony to determine whether it sufficiently outweighed the department's evidence such that the preponderance of the evidence no longer pointed to the existence of a child.

[22]As noted above, see note 3, *supra*, the parents sought a stay of the judge's order that they be committed to a house of correction, but do not challenge the sanction itself.

As to the first claim, G. L. c. 119, § 24, authorized the judge to order the parents to present their child for identification. When they failed to do so, he could enforce his order through his contempt power. See *Doe* v. *Commonwealth*, 396 Mass. 421, 422 (1985) ("court has the inherent power to impose sanctions for contempt of its orders"). Noncompliance with a judge's valid order may be excused where it becomes impossible, but the burden lies with the parents to prove impossibility. *Commonwealth* v. *One 1987 Ford Econoline Van*, 413 Mass. 407, 412 (1992), and cases cited. The parents have failed to meet their burden, for the judge's finding on February 8 that there is a child who may be in need of care and protection is not clearly erroneous, and the parents have since offered no evidence to the contrary.

Second, the parents take issue with the judge's February 8 ruling that "in the alternative" they can purge the contempt "by providing sufficient evidence that no child exists by identifying the location of the alleged burial site."[23] As we have already described, the parents originally claimed a constitutional right not to produce their child or to testify to the infant's whereabouts, for fear they would be charged with "harm" or "abuse" of their child.[24] See notes 8 and 20, *supra*. When those arguments failed, the parents changed tactics, claiming that the judge's ruling compels them to incriminate themselves, not by forcing them to produce their child, but by forcing them to testify as to the location of the child's remains.[25] Their latest

---

[23]The judge stated that the parents "will remain in Contempt of this Court until they produce the child for 'identification' as mandated by statute or in the alternative, until they satisfy the reasonable concerns of this Court and the authorities by providing sufficient evidence that no child exists by identifying the location of the alleged burial site." He restated this in a subsequent judgment of contempt, issued on February 14, when the parents again failed to present the child for identification.

[24]In his initial judgments of contempt entered on January 17, before the parents claimed that the mother had suffered a miscarriage, the judge stated that the parents could purge the contempt by "present[ing] the subject child or disclos[ing] the child's whereabouts."

[25]Violation of G. L. c. 114, § 43M, is a misdemeanor, and subjects a person to a penalty of incarceration, as well as a fine. G. L. c. 114, § 43N. Thus, testimony as to the location of a dead human body may, in some circumstances, tend to incriminate a witness.

argument is equally unavailing because any testimony the parents offer to purge the contempt is not government compelled.

From the outset the parents had every opportunity to rebut the department's claim that there was a child in need of care and protection, and to establish by credible evidence that the mother had suffered a miscarriage. They did not do so. The judge stated at the January 15 and February 5 hearings that had the parents initially informed him that no child existed he would have dismissed the care and protection petition "out-of-hand." But the parents' initial claims to the judge (and later to a single justice of the Appeals Court and to a single justice of this court), were grounded on an assumption that a child did exist. See notes 20 and 21, *supra.*

When the parents embarked on a new strategy, the judge immediately reopened the seventy-two hour hearing to allow the parents to come forward with any "testimonial or medical evidence that in fact a miscarriage occurred." They proffered only their own testimony, which the judge deemed not credible, for good reason: their testimony was devoid of specific details of the miscarriage and at odds with their earlier claims. In this context the judge's statement that the parents could purge the contempt "by identifying the location of the alleged burial site," was but an indication of such evidence as would convince him that no child existed. The judge's decision that more was needed than the parents' self-serving statements does not amount to government compulsion. See *United States* v. *Rylander,* 460 U.S. 752, 758-759 (1983) (possible failure of proof on issue in contempt proceeding where contemnor had burden of proof not "compulsion"). Nor do we read his order as precluding the parents from offering any other weighty and credible evidence that a miscarriage had occurred, thereby purging the contempt. Pressure now felt by the parents to come forward with such evidence is a consequence of their own actions, not any action by the judge. Any requirement that they proffer additional evidence, including their own testimony about the location of the infant's remains, does not violate the parents' constitutional rights against self-incrimination. See *United States* v. *Butler,* 211 F.3d 826, 832 (4th Cir. 2000), cert. denied, 531 U.S. 1149 (2001) (testimony offered to purge contempt judgment, which

required contemnor either to pay over settlement funds or to testify as to their disposition, was not "compelled").

## IV

The parents argue that the judge was biased and should have recused himself. They point to the fact that in the earlier care and protection proceedings, he had appointed a "self-proclaimed 'cult deprogrammer' " as guardian ad litem, whose reports to the court were "heavily influenced by his own organization's 'deprogramming' agenda," and contained "very sensational accounts" of conversations with the parents. As a result of the guardian ad litem's "skewed and highly sensationalized reports," the parents argue, the judge formed the "indelible opinion" that they belong to a "dangerous cult that endangers the lives of children."

The law concerning recusal of a judge is well established: the decision to withdraw rests first within his sound discretion. *Haddad* v. *Gonzalez*, 410 Mass. 855, 862 (1991). Here the judge determined that, notwithstanding his earlier involvement with the parents, he need not recuse himself. We have reviewed the entire record, and conclude that the judge did not abuse his discretion.

We consider first the timeliness of the parents' motion to recuse. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 428 Mass. 543, 547-548 (1998), *S.C.*, 432 Mass. 43 (2000). The parents delayed their recusal request until the proceedings were well underway, by which time the judge had issued his initial order requiring the parents to present the child for identification, and had found the parents in contempt for their failure to comply with his order. Any concern of the parents of the judge's involvement in the earlier care and protection proceedings should have been raised at the outset. Their belated request suggests a tactical decision in the face of an adverse ruling. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, *supra* at 550.

The parents have also failed to show that any alleged bias of the judge stemmed from an extrajudicial source. See *Demoulas* v. *Demoulas Super Mkts., Inc.*, 424 Mass. 501, 524-525 (1997), *S.C.*, 428 Mass. 543 (1998). "[N]ot subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by

judges as a result of what they learned in earlier proceedings." *Liteky* v. *United States*, 510 U.S. 540, 551 (1994). Although it is possible that an unfavorable disposition could develop during prior proceedings, where that disposition is not "so extreme as to display clear inability to render fair judgment," it does not warrant recusal for bias. *Id.* The judge's actions in those proceedings to which the parents point as evidence of bias have been upheld on appeal. *Adoption of Fran*, 54 Mass. App. Ct. 455 (2002). We see no abuse of discretion in his refusal to recuse himself on that basis.

The parents also take issue with the judge's statement in his February 8 contempt judgment that the parents' testimony, given after affirmation, was "mere assertion, not under oath." The judge was not entitled to attribute less veracity to their testimony because they chose to affirm rather than take an oath. See G. L. c. 233, §§ 17-19. His characterization of their testimony suggesting that he did so was inappropriate. But the judge had a plethora of reasons to disbelieve the parents' testimony. We are confident that any possibility of an improper inference drawn from the parents' failure to take an oath is insignificant in context.

*Judgments affirmed.*