## Custody of Michel & three other minors.

No. 88-P-1361.

Middlesex. November 16, 1989. - February 7, 1990.

Present: Warner, C.J., Armstrong, & Kass, JJ.

*Parent and Child*, Care and protection of minor. *Minor*, Custody. *Practice, Civil*, Care and protection proceeding. *Evidence*, Child custody proceeding, Report of licensed social worker, Expert opinion, Hearsay, Public documents, State of mind. *Witness*, Expert.

In a proceeding on a petition for the care and protection of four minor children, the judge did not err in admitting in evidence the testimony and report of a licensed social worker who had been appointed as an expert pursuant to G. L. c. 119, § 24, despite the inclusion in the testimony and report of certain clinical observations and hearsay. [265-266]

In a proceeding on a petition for the care and protection of four minor children, the judge did not err in admitting in evidence a report under G. L. c. 119, § 51A, of suspected abuse and neglect and the report of the investigation which the Department of Social Services is required to make under G. L. c. 119, § 51B, in response to a § 51A report, despite the inclusion in the reports of certain hearsay. [266-267]

In a proceeding on a petition for the care and protection of four minor children, the judge did not err in referring in his findings to statements of the children made to social workers, teachers, evaluators, and investigators where, while the hearsay statements could not be relayed by others for their truth, the statements were admissible either as they reflected state of mind, or as they were used in formation of an expert opinion given by professionals, or when used for diagnostic or treatment purposes. [267-268]

On an appeal by parents and their three younger children from a judge's determination that the children are in need of care and protection and an order committing them to the temporary custody of the Department of Social Services, there was no merit in the parents' argument that the judge's concluding findings were fatally flawed by his subsidiary finding that the mother "may be involved with [the father's psychological] disorder in that they have a shared paranoid disorder." [268-269]

In a proceeding on a petition for the care and protection of four minor children the judge did not err in ordering the youngest child committed to the temporary custody of the Department of Social Services even though it did not appear that the child had suffered maltreatment, where there was substantial evidence that the parents had failed seri-

ously in providing education, nutrition, and hygiene to their older children. [269-270]

In a proceeding, under G. L. c. 119, §§ 24 & 26, brought by the Department of Social Services for the care and protection of four minor children, the judge's findings, focusing on the consistent inability or unwillingness of their parents to cooperate with service plans and the comparative improvement in the mental health of the older children while in foster homes, were supported by the evidence and warranted his determinations that the parents were currently unfit to act as parents and that the children be committed to the temporary custody of the Department of Social Services. [270]

PETITION filed in the Cambridge Division of the District Court Department on March 16, 1987.

The case was heard by *Paul C. Menton*, J.

*Jamie Ann Sabino* for the parents.

*Douglas H. Wilkins*, Assistant Attorney General, for Department of Social Services.

*Bernard W. Fang & Jonathan Brant*, for the three younger minors, submitted a brief.

KASS, J. As of the time this opinion is written, the ages of the four children concerned are thirteen, eight, seven and five. A District Court judge, acting on a petition for care and protection (G. L. c. 119, §§ 24 and 26), adjudged that neither their biological mother nor father was currently fit to act as a parent and that the children were in need of care and protection. Accordingly, the judge committed the children temporarily to the custody of the Department of Social Services (DSS). His order also required DSS to establish a service plan to effect the ultimate reunification of the family unit. The parents and the three younger children have appealed from the custody component of the order. No appeal was entered on behalf of the oldest child, Michel.[1]

For the general framework which governs review of care and protection orders, we refer the reader to *Custody of Two Minors*, 396 Mass. 610, 616-619 (1986). The District Court judge made extensive findings of fact, which we summarize.

---

[1]All names, in accordance with our practice in these cases, are fictitious.

What we shall call the Emman family first came to the attention of DSS in September, 1979, through the filing, pursuant to G. L. c. 119, § 51A, of a report of suspected child abuse. Then recently arrived from France,[2] the family[3] had, through public assistance, been billeted in a YMCA where the father's verbal and physical assaults upon his family attracted notice. The staff's consciousness of the father's violent shaking of his three year old son, his threats to throw him out a window, and his beating of his wife was raised by the father's accusations of anti-Semitism against all who sought to intervene. In the ensuing six months, two more § 51A reports about the Emman family were filed and, conformably with G. L. c. 119, § 51B, investigated and substantiated.

In June, 1980, the Emman family left the Commonwealth. Six years later the family were back in Massachusetts, now including a daughter and two more sons. In November, 1986, the father beat the mother severely with a broom, causing a victim witness advocate to file yet another § 51A report out of concern for the emotional harm being done to the children from observing their mother consistently beaten. The events that occurred in November, 1986, gave rise to an order under G. L. c. 209A, § 3(b), requiring the father to vacate the apartment. Indeed, the broom beating incident propelled the father into a sojourn at Metropolitan State Hospital.

For several months the family lived separately from the father and DSS assisted the mother. Michel's frequent absence from school provoked an investigation and revealed that the father was back in the picture and that the family were often sleeping at the father's residence.[4] On March 13, 1987, a DSS social worker came to help. The scene was one of chaos and degradation. Michel was convinced he would be kidnapped and killed if he went to school. The boys were eat-

---

[2] The mother is American born. The father was born in Morocco and appears to have spent most of his life prior to 1979 in France.

[3] In 1979, the Emmans had only one child.

[4] What the sources of funds for rent and food were is obscure. Throughout all times material, neither parent was employed.

ing cake frosting for lunch. There was insufficient food in the house. When the social worker returned later that day to the father's apartment, the father and three of the children were locked in the house. With police intervention, the children were removed through a second story window. Over the weekend, the four Emman children were placed in foster care. They were returned by court order upon condition that the father would abide by the c. 209A order and would adhere to a visiting schedule prescribed by a Probate Court judge.

At school, Michel demonstrated sleepiness, poor eye contact and little interaction with his peers. He vomited frequently, talked to himself in different voices, was preoccupied with violence, and scored 64 on an I.Q. test. When asked about his father, Michel lay on the floor mute and attempted communication in sign language. Neither mother nor father cooperated with recommended psychotherapy for Michel. A treatment team concluded that his psychological distress was a result of physical, emotional, and interpersonal deprivation in his biological home. After placement in foster care, Michel made developmental, social, academic, and emotional gains. He learned to read, made friends at school, participated in sports, and was able to talk about his life.

The next oldest child, Julia, was enrolled in kindergarten. On several occasions the father turned up at the school and made scenes which included accusations that school staff were anti-Semitic and acted like Gestapo. At a day camp to which all four children were sent, the father added Francophobia to the customary charges of anti-Semitism.

In June, 1987, the mother signed a service plan, but the father refused to do so. Cooperation by the parents with the plan was inconstant and, in sum, insufficient. Social workers who worked with the family reported the children as running around and throwing things, not least of all knives, which they directed toward the mother. Clothes and toys were strewn about, the walls were dirty, the two beds on which the four children slept lacked bedclothes. Without further satu-

ration in detail, it may safely be said that no parental hand was managing the family.

The father suffered from multiple personality disorders, which included paranoid, narcissistic, and anti-social features. His lapsing into violent behavior was unpredictable. His claimed educational background was inconsistent with his functioning and use of language, suggesting delusions or possible organic brain disease.

The mother displayed neither ability nor will to act independently of the father in respect of herself or the children. She was able to see few alternatives to the destructive pattern of life in which she was enmeshed and fell into depression and self-loathing. Although conscious of her difficulties, she is anxious about being seen as betraying her husband. Couples therapy and family therapy were "contraindicated," largely because the father's volatile reactions precluded speaking freely.

The three younger children underwent psychological evaluations at New England Medical Center. Julia was a depressed child whose inner life was dominated with longing for a new father and for a mother who would be more available to her. She is at risk for deeper depression and poor self esteem. She requires an environment in which she is free from worrying about the well being of the significant adults in her life.

Norman, who is next in line, reflects abnormal anxiety and inarticulate speech. In school, he chose to be mute for a year and a half. He has fantasies of being kidnapped and killed and a preoccupation with physical injury. It is most important for Norman to live in an environment where hostility and aggression are controlled. The youngest child, Oscar, has not yet been maimed emotionally. The judge determined, however, that in the absence of cooperation by the parents with DSS counseling and supervision — which they had not yet managed — Oscar was at risk of serious emotional injury if allowed to remain with his mother and father.

Their illness and destructive family relationship, the judge concluded, rendered the mother and father unfit as parents.

He so found by clear and convincing evidence. The children required care and protection. Nonetheless, the judge adhered to reunification of the family unit as a goal and laid down a ten-point service plan which DSS was to design and pursue. The details of that aspect of the order are not in contention.

1. *Admissibility of investigator's report. a. The report of the § 24 investigator.* Acting under G. L. c. 119, § 24, as appearing in St. 1983, c. 182, the District Court judge appointed Patricia Hunt, a licensed social worker, to investigate the "conditions affecting the child[ren]." By the terms of § 24, the investigator's report is part of the record in the case. There can, therefore, be no objection in general to the receipt and use of such reports in arriving at decisions in care and protection proceedings. *Custody of a Minor (No.2),* 378 Mass. 712, 723 (1979). *Custody of Jennifer,* 25 Mass. App. Ct. 241, 245 (1988). See also *Care & Protection of Benjamin,* 403 Mass. 24, 27 n.5 (1988). What the parents complain of is that the Hunt report and Hunt's testimony[5] contained clinical observations, for example, about their "paranoid thinking," "paranoid ideation," "obsessive and narrow cognitive style," and "damaging emotional fusion with children," which are beyond her professional competence.

It may be a sufficient response to observe that the record reflects no effort to redact the Hunt report. Beyond that, a licensed social worker is not sterilized from casting observations about a family in the vocabulary of psychology. As a statutory matter "[t]he practice of social work" performed by a licensed social worker includes "the formulation of a psychosocial evaluation" and "the utilization of psychological and interpersonal theories and related practice methodologies to assess, interpret and modify conscious and unconscious processes of behavior." G. L. c. 112, §§ 130, 131, as in-

[5]Tape recordings of the trial were available to appellate counsel. Transcriptions of certain preliminary hearings were not available to counsel before briefs were filed. There is no suggestion that there was at any point a material deviation in testimony Hunt gave by speech from what she said in her reports.

serted by St. 1977, c. 818, § 2. The language of psychology is hardly a foreign tongue to licensed social workers and is one in which they may be expected to express themselves.

When a judge appoints an investigator under G. L. c. 119, § 24, it signifies the judge's expectation that the licensed social worker has the training and specialized knowledge which will enable the social worker to make and report acute observations about the interactions of family members and their respective mental conditions. The act of appointment carries with it qualification of the designated professional as an expert on pathological family dynamics. See G. L. c. 119, § 21. Qualification of experts is a discretionary function of a trial judge to which we accord great deference. *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975). *Commonwealth* v. *Seit*, 373 Mass. 83, 92 (1977). *Cronin* v. *McCarthy*, 22 Mass. App. Ct. 448, 449 (1986).

An additional grievance which the parents have with the Hunt reports is that they include statements made by third persons to individuals whom she interviewed in the course of her investigation, i.e., totem pole hearsay. That the report of an investigator appointed under § 24 may contain hearsay is settled. *Custody of Jennifer*, 25 Mass. App. Ct. at 245, and cases there cited. The cases draw no distinction between levels of hearsay. It stands to reason that an investigator will talk to neighbors, teachers, social workers, mental health workers, relatives, and friends, and some of those persons will describe what they heard from third persons. The remedy is not to attempt to purge secondary hearsay from § 24 reports but to afford an opportunity to refute the investigator and the investigator's sources through cross-examination and other means. See *Gilmore* v. *Gilmore*, 369 Mass. 598, 604-605 (1976); *Custody of Two Minors*, 19 Mass. App. Ct. 552, 559 (1985). See also *Duro* v. *Duro*, 392 Mass. 574, 580 & n.9 (1984). The parents do not complain that their rights of examination were foreclosed in any way.

b. *Admissibility of § 51A and § 51B reports.* Again for the reason that they contain hearsay and second level hearsay, the parents object to the receipt in evidence of the report

under G. L. c. 119, § 51A, of suspected abuse and neglect and the investigation and report which DSS is required to make under G. L. c. 119, § 51B, in response to a § 51A report. What the evidentiary status of those reports was is not ascertainable on the record, but, for the sake of the discussion, we will accept that they were before the judge. One would suppose as much as the § 51A and § 51B reports are part of the paper trail which explains the bringing of the petition under § 24. The utility of the § 51A and § 51B reports is to set the stage; the judge's findings do not intimate that he used them for anything more.

During the course of his findings the judge thrice mentioned the § 51A and § 51B reports, each time in the context of explaining how the Emman family repeatedly came to the attention of DSS. It may be added that the § 51B report is a required government report and may be considered for statements of fact, e.g., that there was screaming or beating or no food or clean diapers in the house, although not for purposes of diagnosis, prognosis, and evaluation. See *Adoption of George*, 27 Mass. App. Ct. 265, 271-275 (1989).

Primary reliance concerning the family picture will be on the § 24 report. Such is the import of the statutory language which provides for the appointment of a person to investigate the conditions affecting the children. It is cast in a mandatory mode.

c. *Reports of children's statements.* On ten occasions in his findings the judge referred to statements of the various Emman children made to social workers, teachers, evaluators, and investigators. The parents once more argue improper use of hearsay. While statements of the children could not be relayed by others for their truth, those statements were admissible insofar as they reflected the mental state of the children at the time. *Custody of Jennifer*, 25 Mass. App. Ct. at 243. State of mind of a child is often a material issue in care and protection proceedings. *Ibid.* Hearsay statements of the children made to and reported by professionals may be admissible on the additional ground that they were used in formation of an expert opinion given by the professional.

*Commonwealth* v. *Lewandowski*, 22 Mass. App. Ct. 148, 150-151 (1986). Similarly, children's statements may be admissible when used for diagnostic or treatment purposes. *Commonwealth* v. *Comtois*, 399 Mass. 668, 675 (1987). *Morgan* v. *Foretich*, 846 F.2d 941, 949 (4th Cir. 1988). The bulk of the judge's findings which refer to the children's hearsay statements concern statements made to professionals who had been asked to evaluate the children.

As to two specific statements made by two of the children, there are independent sources which make the statements admissible. Michel's statements that he feared being kidnapped and killed if he attended school, that his parents had been arguing, and that his mother received a bruise on her leg appeared in the investigator's § 24 report. One might add that Michel's saying that he feared being kidnapped and killed bore on his state of mind, not the truth of the matter asserted. Cf. *Custody of Jennifer*, 25 Mass. App. Ct. at 243. Julia's statements about watching horror movies similarly reflect state of mind and are disclosed in the § 24 report.

2. *Finding of "shared paranoid disorder."* There is no merit in the parents' argument that the judge's concluding findings are fatally flawed by his subsidiary finding number forty-seven that the mother "may be involved with [the father's psychological] disorder in that they have a shared paranoid disorder." The contention appears to be that the record does not support such a finding and that it is, therefore, clearly erroneous. The source of the finding is not mysterious. Among the materials furnished to the judge was a psychiatric evaluation of the father performed by the Cambridge Hospital which said: "His wife may be involved with his disorder to the extent that they have a shared paranoid disorder." The point the parents urge is that there was no basis for the judge's finding because the author of the Cambridge Hospital report expressly stated that "[t]he reliability of this evaluation is uncertain due to inconsistent history, incomplete neurological evaluation, and Mr. [Emman's] refusal to cooperate fully with psychological testing." A quali-

fied evaluation, however, may support a similarly qualified judicial finding.

In any event, the "shared paranoid disorder" finding is not close to the center of the judge's detailed findings which, as previously summarized, reflect grave psychological disorder on the part of the parents. Even without the abundantly available professional evaluations, the objective facts of the father's conduct compelled the judge's finding of paranoia and anti-social behavior by the father. As for the mother, the evidence emphasized her dependent personality. It was inevitable, therefore, that the mother's and father's psychological disorders intersected. The "shared paranoid disorder" finding was neither unwarranted nor significant.

3. *Custody of the youngest child.* As to the youngest child, Oscar, counsel for the children and the parents insist that there is no justification for removing him from the custody of the parents because there was no clear and convincing evidence that Oscar had been abused and because Oscar had demonstrated no signs of serious emotional harm. The parents separately argue that the judge made no specific findings about their ability to care for Oscar.

Parental fitness is tied to what lies in the best interests of the children. *Care & Protection of Zelda*, 26 Mass. 869, 871-872 (1989). Here, there was substantial evidence that the parents had failed seriously in providing education, nutrition, and hygiene, let alone the rudiments of an organized and supportive family structure. The older siblings had descended into varying stages of psychological pathology, and the reason Oscar manifested relatively little emotional damage is that his limited contact with his parents caused him to endure comparably less hardship.

Temporary removal of a child from biological parents does not require that the child have suffered maltreatment. *Custody of a Minor (No. 1)*, 377 Mass. 876, 882-883 (1979). In effecting the purposes of the care and protection statute, the State's interest extends beyond taking remedial action. See *id.* at 882, 883 n.6. A judge sitting on this sort of case does not have to wait for disaster to happen. In determining pa-

rental fitness a judge may use past conduct to predict future ability and performance. *Custody of Two Minors*, 396 Mass. at 621. *Care & Protection of Stephen*, 401 Mass. 144, 152 (1987). *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 689, 694-695 (1985). *Adoption of George*, 27 Mass. App. Ct. at 268.

4. *Sufficiency of the evidence*. It is a reflection of the gravity of removal of children from their biological parents that clear and convincing evidence of parental unfitness is required. See *Care & Protection of Three Minors*, 392 Mass. 704, 711-712 (1984); *Care & Protection of Stephen*, 401 Mass. at 150-151. We have reviewed the record in the light of those criteria and with the usual understanding that the trial judge's findings are to stand unless clearly erroneous. *Custody of Two Minors*, 396 Mass. at 618. *Care & Protection of Valerie*, 403 Mass. 317, 318-319 (1988).

No purpose is served in recapitulating the facts summarized at the beginning of this opinion, for which there was adequate foundation in the record. Particularly, the judge was entitled to focus on the consistent inability or unwillingness of the parents to cooperate with service plans and the comparative improvement in the mental health of the older children while in foster homes. At that, the opportunity of the parents to regain custody has not been cut off. Should they be able to organize a home life sufficiently stable to meet the needs of their children, reunification remains the goal of the judge's order. See G. L. c. 119, §§ 1, 26(2) (iii). In the meantime, the intervention of the court was proper. See *Custody of a Minor (No. 1)*, 377 Mass. at 882.

> *Orders committing the children to the care and protection of the Department of Social Services affirmed.*