BLAKE, J.
*771 *1183 Following a trial in the Juvenile Court, the judge found that the mother was unfit to assume parental responsibility of two children, terminated her parental rights, and declined to order posttermination visitation. The mother appeals contending that the Department of Children and Families (department) failed to prove her unfitness by clear and convincing evidence and that the judge abused his discretion in declining to order posttermination *772 visitation.[2] We affirm.
1. Background. The mother has a long history of serious mental health issues, including anxiety and depression. In 2013, the department received a report pursuant to G. L. c. 119, § 51A (51A report), alleging that Julie (born in 2005) sexually abused Querida (born in 2002) while in the mother's care. The department did not remove the children, but the case remained open for services. In 2015, five additional 51A reports were received over a six-month period. These reports included allegations that the mother was drinking and smoking marijuana to excess, hitting the children, and failing to get the children to school. The department continued to provide services to the family while investigating the reports. In November, 2015, another 51A report was filed that led to the children's removal. This report was filed as a result of the mother taking Julie to the emergency room because she had been coloring on the walls and on toys. During this hospital visit, the mother indicated that her boy friend had hit Julie. The department conducted an investigation pursuant to G. L. c. 119, § 51B (51B investigation), issued a report (51B report) supporting the allegations, and filed a care and protection petition on behalf of the children.
a. School attendance. As part of the 51B investigation, school personnel reported that the children had between fifty and sixty absences each, for each of the past two years. In response, the mother blamed the children and had numerous excuses for her failure to both get the children to school and get them to school on time. School personnel reported that the mother was often inappropriate in front of the children, calling the children "horrible" and suggesting "she should give them to the state."
b. Medical and educational needs. Both children have significant medical needs. Querida suffers from asthma and a number of food and environmental allergies. She has been prescribed multiple medications, which she must take daily, and has an EpiPen. Julie has been diagnosed with major depressive disorder and moderate cognitive disorder. She performs in the "extremely low" range of intellectual functioning and suffers from "visual-perceptual motor deficits." Julie also suffers from other maladies, including nightmares. She is prescribed medication for agitation.
The mother has been unable to manage the children's medical needs. She is unable to make sure that Querida takes her medication *773 daily. Indeed, Querida reported that *1184 her medications were "all over the place" at the mother's home. In addition, the mother smoked in the house, which aggravated Querida's asthma. Querida's pediatrician confirmed that her asthma was poorly controlled in the mother's care.
Julie is a student and resident at a school for children with special behavioral and emotional needs. Due to the mother's behavior at a visit, she was barred from the school grounds.
At the time of trial, both children were up to date medically and receiving counselling. Since her placement with the department, Querida has not had an asthma attack and was attending school regularly. At the time of trial, Julie was happy and comfortable in her school placement.
c. Interactions with the department. The mother was understandably upset when the department removed the children from her care. She threatened to kill a department social worker and sue the department. Due to the mother's behavior, an ambulance was called. Over the course of the 51B investigation, the mother screamed at department social workers and continued her threats to assault them.
The department created a service plan for the mother that, for the most part, she either refused or was unable to comply with. Prior to the children's removal, the tasks included monthly meetings with the department, ensuring the children attended school and received necessary medical care, maintaining consistent mental health treatment for herself and the children, keeping all appointments with supportive care groups, and getting a parenting psychological evaluation. After the children's removal, the service plan was amended to include demonstrating appropriate behavior at visitation, maintaining all scheduled medical appointments, getting a parenting psychological evaluation, and setting boundaries for her conduct with the children.[3] At trial, the mother stated that she "[didn't] need to learn anymore of how to be a mother."
d. Domestic violence. The mother has a history of relationships with men who abuse her. She was the victim of physical and sexual abuse at the hands of her partners. The children reported that Julie's putative father had hit both of them. The mother reported that when the girls informed her of this, she struck him. Despite this history, the mother had left both children with him at times.
*774 e. Visitation. The majority of weekly visits were problematic. The mother yelled at the children and blamed them for turning the department against her. During a visit in August, 2016, the department called an ambulance when the mother became "irate" when the social worker tried to redirect the mother from her radio to paying attention to the children. During visits, the mother often brought up inappropriate topics with the children, spent time on the telephone and taking photographs of herself, and frequently cried. At a visit at the department office, a Massachusetts State police trooper had to intervene because the mother was described as "dysregulated." In addition, the mother brought men to the visits, including one who had been abusive to her. The mother's last visit with Querida was in September, 2016, and since then the mother has only requested a visit once, which Querida refused. The mother told a social worker that "she can put [Querida] up for adoption, but she will fight for [Julie]."
f. Behavior at trial. The mother had numerous outbursts during the trial. During *1185 the testimony of a social worker, the mother yelled out that the social worker was a "home wrecker," a "piece of crap," and a "loser." She also yelled that she would "love to[ ] tear [the social worker] up inside like you're lying to me." The judge had the mother removed from the court room until she could compose herself. When the mother returned, she called out that the social worker was a "pathological liar." The judge took a lengthy recess and arranged for the mother to see a mental health provider in the court clinic. The judge expressed that the mother's mental health was "a great concern" but noted that he was not drawing an adverse inference from her absence when court resumed after the recess.
On the next scheduled trial date, the mother became so agitated that the judge suspended the trial and continued the trial to another date. On the day of the rescheduled trial, while in the court house lobby, the mother was swearing loudly. She then became hysterical in the restroom and made suicidal comments to her lawyer and the court clinician. As a result, an ambulance was called for the mother, and she was taken to the hospital. The judge resumed the proceedings in the mother's absence; the department called four witnesses, and the judge heard closing statements. The judge reopened the case for a third day of trial to allow the mother to testify. After a few questions from the department's lawyer, the mother lost her composure. The mother was escorted from the *775 court room,[4] and the proceedings ended after the parties rested.
2. Discussion. a. Judicial bias. The mother claims that statements made by the judge during the proceedings concerning her behavior in the court house and court room demonstrated bias that permeated his decision to terminate her parental rights. In large part, the mother relies on Care & Protection of Bruce, 44 Mass. App. Ct. 758, 694 N.E.2d 27 (1998), to support her claim that the judge's comments reflect bias, speculation, and prognostication. In Care & Protection of Bruce, we held that the judge erred in terminating the mother's parental rights where no nexus existed between her mental health diagnosis and her current ability to parent. Id. at 760-761, 694 N.E.2d 27. Here, to the contrary, the mother's lengthy history of untreated mental illness, in combination with her behavior throughout trial, bears a direct relationship to her ability to care for the children. The judge is free to "use past conduct, medical history, and present events to predict future ability and performance as a parent," and thus the mother's reliance on Care & Protection of Bruce is misplaced. Id. at 761, 694 N.E.2d 27. However, this case presents a larger question of what a trial judge can do when a litigant appears to be in distress in the court house or court room. The judge's observations of the mother throughout these proceedings do not disqualify him, as the mother suggests, from adjudicating the case. See Liteky v. United States, 510 U.S. 540, 554-556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). See also Erickson v. Commonwealth, 462 Mass. 1006, 1007, 966 N.E.2d 795 (2012).
Here, the judge observed the mother at the beginning of trial screaming and threatening witnesses. Initially, he tried to calm her down. It was only after she continued to talk over the judge that he ordered her escorted out of the court room and noted that she was "at a hospital level *1186 of care." He continued that the mother did not "have a right to interrupt and make [the] proceeding untenable ... to conduct." We agree. He then allowed the mother to reenter the court room to "give her another opportunity." Unfortunately, the mother again interrupted the testimony of the social worker in a manner described by the judge as "volatile." The judge took a lengthy recess and arranged for the mother to be seen by the court clinician. The trial continued without the mother *776 present, and the judge stated that he did not draw an adverse inference from her absence. In a further effort to allow the mother to participate in the trial, the judge noted several times that he would "keep the case open to see how [the mother] is," despite protestations from the department's attorney that she did not want permanency delayed.
On the second day of trial, the mother became hysterical in a restroom in the court house and had to be taken from the court house by ambulance. The judge scheduled a third trial day to give the mother the chance to testify. Querida's attorney objected to the further delay, as did the department. The judge responded that "what the Court is trying to do is balance Mother's due process rights to have a hearing and participate in that hearing with what [Querida's counsel] argues is that the children have a right to permanency and a right to have this hearing proceed."
The judge acted with due regard for all parties in a professional, respectful, and judicious way. His orders and comments were appropriately based on impressions he formed from his role in the case, and not from extrajudicial sources. See Adoption of Seth, 29 Mass. App. Ct. 343, 351, 560 N.E.2d 708 (1990). The judge's findings of fact and conclusions of law are amply supported by the record. They reflect the thoughtful consideration of all the evidence. The judge did all he could to provide the mother with a full opportunity to present her case and issued a decision consistent with our statutory and common law.
Moreover, it is well established that "[a] trial judge is responsible for controlling the trial [and] maintaining order in the courtroom." Commonwealth v. Perez, 390 Mass. 308, 316, 455 N.E.2d 632 (1983). After carefully considering the record, we discern no evidence of "antagonism that would make fair judgment impossible." Liteky, 510 U.S. at 555, 114 S.Ct. 1147. The judge took great pains to maintain decorum in the court room in the face of the mother's volatile behavior, while balancing her due process rights.
Passing on the question whether the issue was preserved below, the mother did not file a motion to recuse or otherwise suggest that the judge was biased during the course of the proceedings. See Demoulas v. Demoulas Super Mkts., Inc., 428 Mass. 543, 547, 703 N.E.2d 1141 (1998) ("[A] motion for recusal filed weeks after the conclusion of a trial is presumptively untimely absent a showing of good cause for its tardiness" [citation omitted] ). "The law concerning recusal of a judge is well established: the decision to withdraw rests first within his sound discretion."
*777 Matter of a Care & Protection Summons, 437 Mass. 224, 239, 770 N.E.2d 456 (2002). The absence of such a motion suggests that the judge's statements were not perceived as prejudicial or biased at the time and in the context in which they were made. While the absence of such a motion does not necessarily mean that there was no bias, we take this into consideration when reviewing the record. Poly v. Moylan, 423 Mass. 141, 150, 667 N.E.2d 250 (1996), cert. denied, 519 U.S. 1114, 117 S.Ct. 956, 136 L.Ed.2d 843 (1997).
*1187 b. The mother's unfitness. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606, 976 N.E.2d 814 (2012). The judge "must also find that the current parental unfitness is not a temporary condition." Adoption of Virgil, 93 Mass. App. Ct. 298, 301, 102 N.E.3d 1009 (2018). As it is within the purview of the judge to weigh the evidence, assess the credibility of witnesses, and, accordingly, make findings of fact, the judge's subsidiary findings will remain undisturbed unless shown to be clearly erroneous. See Adoption of Jacques, supra at 606-607, 976 N.E.2d 814. Here, there was an abundance of evidence that supported the judge's conclusion that the mother was unfit to parent both children, and that the unfitness was not temporary. Adoption of Carlos, 413 Mass. 339, 350, 596 N.E.2d 1383 (1992).
The mother challenges fifty-one of the 110 findings of fact. Generally, she contends that the findings are vague, tainted by judicial bias, misleading, lacking foundation, unsupported by evidence, more prejudicial than probative based on the evidence, and improperly based on certain reports. A large number of the mother's challenges to subsidiary findings are waived as they relate to unpreserved issues at trial. Nevertheless, all the contested subsidiary findings are amply supported by the record. Documents submitted by the department as well as testimony of the department social workers support these findings.
Some of the mother's challenges to the findings of fact rely on her contention that "most propounded findings were based on unredacted, even multilevel hearsay rather than competent evidence." She also argues that some of the findings are more prejudicial than probative based on the evidence. These contentions are misplaced. For example, the findings regarding the mother's inappropriate behavior at visits are directly related to her fitness and are supported by substantial evidence.
*778 Many additional challenged findings are based on the judge's credibility determinations, which we do not disturb on appeal. Care & Protection of Martha, 407 Mass. 319, 328, 553 N.E.2d 902 (1990). While troublesome facts may not be ignored by the judge, Adoption of Abby, 62 Mass. App. Ct. 816, 817, 821 N.E.2d 490 (2005), the criticisms presented by the mother go to the weight of the evidence. We give substantial deference to "the judge's assessment of the weight of the evidence and the credibility of the witnesses." Adoption of Quentin, 424 Mass. 882, 886, 678 N.E.2d 1325 (1997), quoting from Custody of Eleanor, 414 Mass. 795, 799, 610 N.E.2d 938 (1993). See Custody of Two Minors, 396 Mass. 610, 618, 487 N.E.2d 1358 (1986).
The mother also challenges the findings that are based on the 51A reports and 51B reports. 51A reports are admissible to "set the stage" to explain how the department became involved with the family. Custody of Michel, 28 Mass. App. Ct. 260, 267, 549 N.E.2d 440 (1990). See Mass. G. Evid. § 1115(b)(2)(A) (2018). All references to the 51A reports in the judge's findings of fact are contained within a section titled "DCF Involvement," and each time the judge referenced the 51A reports, he did so using the words "alleged" or "allegations," making clear that he was not using any information contained in the 51A reports as substantive evidence.
*1188 The judge may, however, rely on statements of fact contained in 51B reports, as those records are admissible as "required government report[s]." Custody of Michel, 28 Mass. App. Ct. at 267, 549 N.E.2d 440. See Mass. G. Evid. § 1115(b)(2)(B) (2018). Such statements of fact include primary facts and hearsay statements, provided they fall within an exception to the hearsay rule. See Adoption of George, 27 Mass. App. Ct. 265, 272-274, 537 N.E.2d 1251 (1989) (primary fact "can be recorded without recourse to discretion and judgment" and is admissible under "public documents or official records hearsay exception"). See also Custody of Michel, supra. Furthermore, information contained in an investigator's report is admissible as a statutory exception to the hearsay rule. See Custody of Jennifer, 25 Mass. App. Ct. 241, 245, 517 N.E.2d 187 (1988) ; Mass. G. Evid. § 1115(c)(1) (2018). All the evidence pertaining to the 51A reports and 51B reports was admitted without objection.
Finally, the mother claims that the judge relied on stale evidence pertaining to her history with the department concerning her other children and that such evidence lacked foundation and was irrelevant.
*779 [5] The judge properly considered the mother's history of involvement with the department for its predictive value on the risk of future abuse or neglect. See Custody of Michel, 28 Mass. App. Ct. at 269-270, 549 N.E.2d 440. There was no error.
c. Posttermination visitation. "[T]he decision whether to grant postadoption visits must be left to the sound discretion of the trial judge." Adoption of John, 53 Mass. App. Ct. 431, 439, 759 N.E.2d 747 (2001). This decision is grounded in an analysis of what is in the best interests of the children. Adoption of Ilona, 459 Mass. 53, 63, 944 N.E.2d 115 (2011). This is a highly deferential standard, and here the judge did not abuse his discretion in declining to order such visits. During supervised visits, the mother was unable to control her anger and emotions, and raised inappropriate topics with the children. She also brought men with her to visits, one of whom she admitted had abused her. Querida has refused to visit with the mother, and Julie became anxious and stressed on the days of the scheduled visits with the mother. We discern no error in the judge's determination that posttermination visitation was not in either child's best interests. See id.
Decrees affirmed.

The children's fathers did not appeal from the termination of their parental rights.

The mother did attend weekly mental health services with "Vinfen," but at the time of the trial, she had not attended for two months.

The judge gave the following explanation for the record: "[The mother] has been escorted by two court officers from the courtroom because the Department cannot engage in a question and answer with her because her anger has been so volatile that there's no way that counsel can engage in a cross-examination of the witness."

The mother has three older children. She first became involved with the department in 1996 in connection with allegations that she neglected her eldest child. Her parental rights to this child were terminated and the child was adopted. In 2002, the second and third eldest children were removed from the mother's care and eventually adopted.