NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1051

ADOPTION OF GRAYSON (and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found the father and the mother unfit to parent their children Grayson, born in 2015, Amy, born in 2016, and Alan, born in 2018 (collectively, the three children), and terminated their parental rights to the three children. Both parents argue on appeal that their due process rights were violated when, as a result of the COVID-19 pandemic, the judge conducted the trial via the Internet-based video conferencing platform Zoom (Zoom), contending that she did so without safeguards later recommended in Adoption of Patty, 489 Mass. 630, 645-648 (2022). Both parents further argue that the judge was biased against them. The father also contends that the judge improperly admitted certain statements of children contained in documentary evidence including reports of the Department of Children and Families (DCF) pursuant to G. L.

_____

[1] Adoption of Amy, and Adoption of Alan. The children's names are pseudonyms.

c. 119, § 51B (51B reports), as permitted by Adoption of Luc, 484 Mass. 139, 152-153 (2020). Finally, the mother argues that the judge erred in finding her unfit. We affirm.

Background. In 2013, before the three children were born, DCF became involved with the mother after reports pursuant to G. L. c. 119, § 51A (51A reports), were filed and later substantiated as to neglect of two of her older children, Mary and Susan.[2] As a result, Mary and Susan remained in the custody of DCF for several years, and DCF generated service plans for the mother, which were amended to include the three children after they were born. The mother was diagnosed with bipolar disorder and posttraumatic stress disorder (PTSD), but in 2011 stopped taking medication for those conditions.[3]

In November 2016, a 51A report was filed alleging neglect of both Grayson, then one year old, and Amy, then three months old, after police and the family's DCF ongoing social worker responded to the hotel where the mother and father were living with those two children.[4] The mother reported that she and the father had engaged in a verbal argument. At trial, the father

---

[2] These children's names are also pseudonyms. The mother's parental rights as to them are not at issue here. The father here is not their father.
[3] At trial, the mother testified that she then was taking medication for bipolar disorder and PTSD.
[4] During the first year of Grayson's life, two 51A reports were filed alleging neglect, but both were unsupported.

testified that the mother was "very erratic, very violent, throwing things . . . , being very vulgar, very disruptive." DCF created a safety plan under which the father would be the caretaker for Grayson and Amy while the mother went to a hospital for an evaluation.  However, shortly after arriving at the hospital, the mother left and later refused to attend an outpatient program because day care was not available for Grayson and Amy.  When a DCF investigator reminded the father that he was supposed to be acting as the caretaker for Grayson and Amy, the father raised his voice, asked to speak to a supervisor, and hung up the telephone.

In April 2017, a 51A report was filed that was later substantiated to the extent that it alleged that during a visit, Mary and Susan were subjected to neglect by both the father and the mother.  During the investigation, Susan disclosed that the father disciplined her and Mary by requiring them to hold a "plank" position until he said they could stop.  The father admitted to DCF that he disciplined Mary and Susan by requiring them to perform "planking," and he testified at trial that they "enjoy[ed] doing it."  The mother also testified that the father disciplined Mary and Susan with planking.

By mid-2017, both the mother and the father had fully completed the tasks set on DCF's most recent service plan. Beginning in June 2017, Mary, then six years old, and Susan,

then four, lived with the mother, the father, Grayson, and Amy. At that time, DCF's family action plan included tasks that both the father and the mother engage actively in mental health counselling to address their personal trauma history and how it affected their parenting skills. Both the father and the mother later claimed to be engaged in individual counselling but did not provide DCF with sufficient information to verify their participation. DCF also provided the parents with a parenting aide, but the parents fired her and would not allow her access to their home.

In September 2017, 51A reports were filed alleging physical abuse of Mary, Susan, and Amy by the father, and neglect of those children and Grayson as a result of witnessing domestic violence in the home. During the ensuing investigation, both Mary and Susan disclosed to DCF that the father hit them with a belt, and Mary reported that the father covered Amy's mouth to stop her from crying. Susan disclosed that she once saw the father push the mother onto a bed, and Mary disclosed that the father and the mother mostly used words to fight but sometimes used their hands. The mother agreed to abide by a DCF safety plan including that she would refrain from physical discipline; the father refused to sign the safety plan.

On October 9, 2017, a 51A report was filed alleging physical abuse of Mary by the father, after Mary disclosed to

4

her attorney that a bruise on her hip was caused when the father pushed her to the ground. During the ensuing investigation, an additional 51A report was filed alleging neglect of all four children, and DCF filed care and protection petitions.

The next day, October 10, 2017, DCF workers and police went to the home to take emergency custody of Grayson, then two and one-half years old, and Amy, then fourteen months old.[5] For over two hours, the father refused to open the door, yelling that the DCF workers could be arrested for kidnapping. To a police officer, the father stated that Mary sustained the bruise when she hit her hip on a doorway while he was "tossing the racks."[6] At trial, the mother testified that the father did "toss the racks" by throwing mattresses on the floor when beds were not made properly.

On October 31, 2017, the mother obtained a G. L. c. 209A order (209A order) against the father requiring that he refrain from abusing her, not contact her, and stay at least fifty yards away from her.[7] A week later, the mother requested that the 209A

---

[5] Mary and Susan were also taken into emergency DCF custody, but they were removed from their schools.
[6] The 51B report included a police officer's description of a military term that applies when a superior officer inspects a subordinate's bunk and determines that it is not made to the proper standard, and the superior "tosses the rack" by making a mess of the bunk and requiring the subordinate to remake it.
[7] The mother's affidavit in support of that 209A order is not in the record.

order be modified to remove the no-contact and stayaway provisions, averring, "I would like to go back to my house," "I also feel I was being pushed by DCF to [apply] for the order," and "I have also found out that we are expect[ing] in . . . 2018."

In November 2017, Grayson and Amy were placed in what became their preadoptive home.

In late 2017 and early 2018, 51A reports were filed after Mary and Susan, who were in a foster placement separate from the three children, made additional disclosures that included physical abuse by the father of Grayson and Amy and witnessing domestic violence by the father of the mother.  Mary disclosed that the father hit Grayson on the head and hit Amy on the head and the buttocks.  Mary also disclosed that she saw the father hit the mother with a belt, his hands, and a toy.  During investigation of those allegations, the father admitted that he used to show the children a belt as a deterrent, and he once used it on Mary.  The father also admitted that Grayson "has been spanked once."

In February 2018, DCF filed an emergency motion to suspend the father's visits with Grayson and Amy.  When the father moved to compel weekly visitation, a Juvenile Court judge appointed a guardian ad litem (visitation GAL) to investigate the facts and circumstances pertaining to the father's visits.  A judge also

appointed a guardian ad litem from the Court Appointed Special Advocates for Children Project (CASA GAL) for Grayson and Amy.

In the spring of 2018, Alan was born.  Two days later, DCF filed a care and protection petition on his behalf.  Alan was placed in the same home as Grayson and Amy.

DCF continued to schedule visits between both parents and the three children.  The mother attended the visits consistently, but the father did not attend at least one scheduled visit, and three visits were cancelled because the father insisted on recording the visits with a body camera.

Throughout 2018, Grayson and Amy displayed adverse reactions before or after visits with each parent and began seeing a trauma therapist.  Those reactions became more serious over time, and included both children having diarrhea, crying and screaming uncontrollably, and clinging to the preadoptive mother.  Amy also experienced panic attacks during diaper changes:  she would cover her eyes and her legs would either go limp or be tightly kept together.  During visits with the mother, Grayson would defecate and then insist that a social worker, and not the mother, take him to the bathroom.  All three children had difficulty interacting with the mother and would gravitate or cling to the social worker.

On June 18, 2018, the father video-recorded DCF personnel without their knowledge and posted the video on a social media

7

website. In a voicemail, the father threatened that he would be "coming after" a DCF supervisor, he could "find her address," and "I promise you there is going to be backlash." As a result, DCF reassigned the family's case to a new team, and sent the father a no-trespass order prohibiting him from coming to the DCF office unless he had an appointment. DCF also instituted a requirement that the father's visitation take place at a DCF office on days when a police detail was present. Because of concerns about domestic violence, DCF scheduled the parents' visits separately.

In mid-2018, DCF's goals for each of the three children changed from reunification with the father and the mother to adoption. Each of the three children has special needs. Grayson has autism, PTSD, anxiety, and attention deficit hyperactivity disorder. Amy has experienced suspected seizure activity, episodes of anxiety and aggression, and panic attacks. Alan has been diagnosed with cerebral palsy and as being on the autism spectrum.

At a November 2018 hearing concerning visitation with Mary and Susan, the mother testified that the father hit her in front of the children and that she was aware that he was hurting the children. In a January 2019 affidavit in support of a 209A order, the mother averred that during the summer of 2017, the father "hit me in front of my children" and "has thrown me on

8

the bed in front of my children."  Nevertheless, the mother

continued to have contact with the father.

Based on his investigation, the visitation GAL recommended

that the father's visits with Grayson and Amy be discontinued.[8]

In May or June of 2019, DCF administratively suspended the

father's visits with Grayson and Amy, and then moved for court

approval of the suspension, which was allowed.  The father's

visits with Alan continued, although he voluntarily missed

visits with Alan for several months in a row throughout 2019 and

2020, and during the COVID-19 pandemic he refused to use

videoconferencing for visits.

During the spring and summer of 2020, the mother visited or

stayed at the father's home on several occasions.  In November

2020, the mother gave birth to a child whose father was another

man against whom the mother had a 209A order based on

allegations of domestic violence.[9]

In a January 2021 affidavit in support of a 209A order, the

mother averred that in the past the father had choked, hit, and

pushed her.  At the related hearing, the mother testified that

---

[8] The visitation GAL later updated that report, recommending that
both parents' parental rights be terminated without visitation.
[9] That child was subsequently placed in the same foster home as
Grayson, Amy, and Alan.  The mother's parental rights as to that
child are not at issue here.

9

the father had beaten her to within an inch of her life, and that she was aware that he had sexually abused the children.

Psychologist Richard Stewart, Ph.D., evaluated the bonds between each of the three children and the preadoptive parents. The judge credited Dr. Stewart's opinion that "there was an important, significant attachment-bond between all three children and the pre-adoptive parents," and that any interruption or termination of those bonds would place the children "at risk of immediate emotional distress and significant future maladjustment." A guardian ad litem (GAL evaluator) appointed to evaluate the case concluded that neither the father nor the mother had demonstrated the ability to correct their issues, including those concerning mental health, domestic violence, and physical abuse, making it unlikely that either would be able to care for the three children.

After eleven nonconsecutive days of trial between March 23 and June 11, 2021, the judge issued decrees terminating the father's and the mother's parental rights to each of the three children and declining to order posttermination visitation. The judge subsequently issued 313 findings of fact and forty-two conclusions of law, "demonstrating, as we require, that close attention was given to the evidence." Adoption of Don, 435 Mass. 158, 165 (2001). Both parents appealed.

10

Discussion.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted).  Adoption of Yalena, 100 Mass. App. Ct. 542, 549 (2021).  DCF bears the burden of proof as to both parental unfitness and best interests.  See Care & Protection of Erin, 443 Mass. 567, 571 (2005).  Because termination of parental rights is an "extreme step, . . . it is appropriate for a judge to consider whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary" (citation omitted).  Care & Protection of Zeb, 489 Mass. 783, 788 (2022).  "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period."  Id., quoting Adoption of Ilona, 459 Mass. 53, 60 (2011).

1.  Safeguards recommended in Adoption of Patty.  Both parents argue that their due process rights were violated when the judge conducted the trial via Zoom without sufficiently adhering to the safeguards later announced in Adoption of Patty, 489 Mass. at 645-647.  See Vazquez Diaz v. Commonwealth, 487 Mass. 336, 342 (2021).  DCF and the three children argue that

11

the mother waived this claim by failing to bring to the judge's attention any difficulties she was having with Zoom. We need not decide whether she waived the claim, because our review of the trial record shows that the judge carefully protected both parents' due process rights and was sufficiently anticipated and implemented what the court later recommended in Adoption of Patty. Although technical difficulties occasionally arose, the judge made appropriate allowances, and neither parent's rights were prejudiced.

The father moved for an in-person trial, which the judge denied, ruling that trial would be conducted via Zoom. Before trial began, the judge informed the parents that if either of them needed an opportunity to speak to counsel, "you have that opportunity. Just let me know."[10] See Adoption of Patty, 489 Mass. at 645-646 ("An explanation of what a breakout room is and how it can be requested and used during a trial should be part of the instructions provided before the commencement of a virtual trial"). The judge explained what the parties should do in the case of technical difficulties: "[I]f you are trying to talk and you don't think I can hear you . . . , just raise your

---

[10] During trial, the judge at one point used the Zoom breakout room to permit the mother to have a private conference with her attorney. On several occasions, the judge took breaks to permit the father to communicate with his counsel by telephone. The father also communicated with counsel during trial by text message.

hand and let me know that you need something."  Contrast id. at 647 ("If discussions had occurred in advance of the hearing, the parties and the court might have been better prepared to enact a troubleshooting plan to try to overcome the technological issues that presented").  During trial, the judge also told the lawyers that they could use the screen-share function on the Zoom video conferencing platform to show documents to witnesses.  See id. at 646 (describing Zoom screen-share function).

In those circumstances, the judge acted within her discretion in choosing to conduct the trial via Zoom, as permitted by the orders of the Supreme Judicial Court and Standing Order 1-21 of the Juvenile Court then in effect.  See Adoption of Patty, 489 Mass. at 642.  The safeguards that the judge described and monitored throughout the trial ensured that the parents' due process rights were protected.  See id. ("assuming the safeguards outlined . . . are provided and monitored, a termination trial conducted via an Internet-based video conferencing platform when, because of the COVID-19 pandemic, in-person proceedings are not possible without jeopardizing the health and safety of the public, is not a per se violation of a parent's right to meaningfully participate").

The father argues that his due process rights were violated by conducting the trial on Zoom because he did not have access to the exhibits during his testimony as he would at an in-person

13

trial. We agree with the judge that any difficulty the father had in reviewing documents arose from his failure to make himself available for his testimony in a private place with access to the documents that were in his possession. On the first day of trial, the father accessed the Zoom trial from his workplace in a warehouse in Ohio. The father was the first witness called by DCF, and during direct examination repeatedly testified that he could not remember events because he did not have documents in front of him. Questioned by the mother's counsel about the possibility of using the Zoom screen-sharing function, the judge stated that she would not permit it then because the father was not in a private location. As recommended in Adoption of Patty, 489 Mass. at 646, the judge confirmed that the father's counsel had given him copies of all of the documents and other exhibits.[11] After the judge told both parents that they needed to appear for the trial in places where each of them could be alone and on video, the father renewed his motion for an in-person trial, which the judge denied. The father then left the Zoom video conference, and so trial resumed with direct examination of the mother. The father briefly

_____

[11] Redactions were required by statutes including G. L. c. 119, § 51E. See Brantley v. Hampden Div. of Probate & Family Court Dep't, 457 Mass. 172, 188 n.22 (2010). Although the record does not establish with certainty that the father received redacted copies of certain exhibits, the father makes no specific argument on appeal with respect to those exhibits.

14

reappeared during the mother's testimony, and then logged off. For the remainder of the day, the judge interrupted the mother's testimony periodically to ask if the father was in the Zoom waiting room and to instruct his counsel to try to reach him by text message.

On the second day of trial, the father moved to continue the trial because of his work responsibilities, which the judge denied.[12] Just after the judge denied the motion, the father stated, "I'm going to excuse myself from proceeding," and then abruptly logged off. The trial continued, during which the judge interrupted the mother's testimony every ten minutes and determined that the father was not the Zoom waiting room. The father's counsel told the judge that she had informed the father by text message that the judge was doing so, and that the father had instructed counsel to renew his request for a continuance every ten minutes. The judge found that the father was "willfully not joining this trial," rather than absent as a result of any technical difficulty.

The father never resumed testifying, and thus was never cross-examined by counsel for the children, the mother, or his own counsel. If he had sought to clarify something in the exhibits or to have access to them when he testified, he could

_____

[12] The father sought to appeal the denial of the continuance, which was denied by a single justice of this court.

15

have instructed his own lawyer to recall him and cross-examine him.[13]  His failure to do so did not amount to a violation of his due process rights.  Contrast Adoption of Patty, 489 Mass. at 646 (self-represented mother participating in Zoom trial by telephone wanted to use "paperwork" in mounting her defense, but lacked understanding of how to do so).

2.  Alleged bias of judge.  Both parents argue that the judge showed bias against them and in favor of DCF.  The mother contends that the judge showed favoritism to DCF by permitting DCF's counsel to "interrupt" witnesses' testimony, and the father contends that the judge was unfair in forming the opinion early in the trial that he was "a very frustrating witness."

Setting aside the question whether the mother preserved this issue below, from our review of the trial record, we conclude that the judge did not display bias for or against any party.  On the contrary, "[t]he judge acted with due regard for all parties in a professional, respectful, and judicious way." Adoption of Querida, 94 Mass. App. Ct. 771, 776 (2019).  See Care & Protection of Doretta, 101 Mass. App. Ct. 584, 594-595 (2022).  To the extent that the judge occasionally provided

_____

[13] On the fifth day of trial, April 28, 2021, the judge allowed the motion to withdraw filed by the father's counsel, and for the remainder of trial, that attorney acted as standby counsel. The judge later stated that if the father decided to call himself as a witness, she would permit him to testify in narrative form.

16

DCF's counsel with reminders or suggestions, she also did so for the father's counsel and for the father when he was representing himself, as well as for the mother's counsel.  Contrast Adoption of Norbert, 83 Mass. App. Ct. 542, 546 (2013) (judge improperly "assumed an active role" and asked many more questions than did the attorneys combined).  At the end of the trial, the judge told the lawyers how grateful she was for their "stellar" work in the case, praising the father's standby counsel as "the MVP."

3. Admission of children's statements in DCF reports.  The father contends that the judge erred in admitting certain statements of children contained in the documentary evidence, including 51B reports and reports of the CASA GAL.  The father moved in limine to exclude or redact those statements, and the judge denied the motion, ruling them admissible as "statements of primary fact" because "the hearsay source[s] w[ere] specifically identified in the document[s] and [were] available for cross-examination, should the party challenging the evidence request to do so."  Adoption of Luc, 484 Mass. at 154.  The father argues that this put him in an untenable position: either call the children as witnesses and cause them additional trauma, or forego calling them and have an adverse inference drawn against him.  The father made no such argument to the judge, and thus it is waived.  In any event, we are not persuaded.

17

The judge scrupulously followed the evidence doctrine applicable in care and protection proceedings set forth in Adoption of Luc, 484 Mass. at 153.  See Care & Protection of Doretta, 101 Mass. App. Ct. at 591.  See also Mass. G. Evid. § 1115(b)(2)(B) (2023).  Essentially, the father asks us to carve an exception out of Adoption of Luc when the hearsay statements were made by children.  In enunciating the doctrine, the Supreme Judicial Court plainly anticipated that it would apply to statements of children contained in DCF reports.  In Adoption of Luc, supra at 152, the court cited Care & Protection of Leo, 38 Mass. App. Ct. 237, 241-242 (1995), in which this court ruled admissible hearsay statements of a child contained in DCF investigator's report so long as the father had the opportunity to call the child as a witness.  We decline to treat the hearsay statements of children differently from those of any other witness.

Moreover, almost all of the statements of children admitted pursuant to Adoption of Luc were those of Mary and Susan, who are not the father's children, and so calling them as witnesses would not have harmed any parent-child bond.  The only statements of any of the three children that were admitted against him were two statements of Grayson.[14]  The first was

_____

[14] The judge also admitted Amy's therapist's testimony that Amy said she did not want to go to visits with the mother because

18

contained in a CASA GAL report that the father had moved to exclude, relating that Grayson had said that his "butt hurts" and the father "hurt me." The judge did not err in admitting that statement under the Adoption of Luc doctrine. See Mass. G. Evid. § 1115(c)(3) (doctrine applies to CASA reports). The judge's findings did not quote that statement, but merely inferred from it that in October 2018, Grayson "began disclosing possible sexual abuse," without concluding that the father was the perpetrator. Thus, that statement was not particularly prejudicial. Further, it was to a considerable degree corroborated by the father's admission to DCF that Grayson "ha[d] been spanked once."

The second statement of Grayson admitted under Adoption of Luc was in a 51B report documenting that on August 4, 2020, Grayson told a DCF staff person that the father put his fingers and his penis in Grayson's "bum."[15] The father moved in limine to exclude that statement, which the judge denied. The judge noted that she considered that statement of Grayson as permitted under Adoption of Luc, 484 Mass. at 154. She did not err.

---

the mother "was not nice." The judge noted that she did not consider that statement for its truth, but only for Amy's state of mind.

[15] The judge did allow the father's requests to exclude similar statements of Grayson to his therapist and the preadoptive mother.

As for the statements of Mary and Susan, those too were properly admitted under Adoption of Luc, 484 Mass. at 154.[16] Further, those two girls' statements about the father's use of "planking" as discipline, his "tossing the racks," and his hitting them with a belt were cumulative of other evidence including the father's own statements to DCF and both parents' trial testimony. See id. at 148 (judge's findings relying on hearsay were "largely cumulative" of testimony). Similarly, the statements of Mary and Susan about witnessing domestic violence by the father against the mother were cumulative of the mother's trial testimony, her averments in affidavits in support of 209A orders, and her testimony at 209A hearings, as testified to by witnesses present at those hearings. See id. It was within the judge's purview to credit the mother's testimony about the domestic violence perpetrated on her by the father. See Adoption of Querida, 94 Mass. App. Ct. at 778. Merely because on other occasions the mother had denied its occurrence did not preclude the judge from crediting her testimony that it did happen.

_____

[16] Some statements of Mary and Susan admitted under the doctrine of Adoption of Luc alleged sexual abuse of them by the father. The judge noted that sexual abuse was not an "essential element" of her finding as to the father's unfitness to parent the three children. See Care & Protection of Laura, 414 Mass. 788, 793-794 (1993).

20

Moreover, the evidence of the father's unfitness was strong.[17]  The judge concluded that DCF had proven by clear and convincing evidence the father's physical abuse of Grayson and his neglect of Grayson and Amy.  The judge also considered the likelihood that Grayson and Amy had witnessed domestic violence the father had inflicted on the mother, and noted that the father never took any course related to domestic violence and invoked his privilege under the Fifth Amendment to the United States Constitution when asked about harming the mother.  The judge further concluded that the father's untreated mental health issues, his character and temperament, and his failure to address his parental shortcomings rendered him unfit to parent the three children.  Based on her own observations of the father at trial, the judge found that he was "uncooperative, abrasive, and controlling."

4.  Mother's unfitness.  The mother argues that the judge erred in finding her unfit to parent the three children.  The mother contends that the judge failed to adequately consider the progress she made, including having a 209A order in place against the father at the time of trial.  The judge declined to credit the mother's testimony that she had not spoken to the father since she obtained a fourth 209A order against him three

---

[17] The father does not contest the sufficiency of evidence of his unfitness.

21

months before trial began. We do not disturb the judge's credibility determinations on appeal. See Adoption of Querida, 94 Mass. App. Ct. at 778.

The judge did credit the testimony of the DCF supervisor that the mother's mental health issues affected her ability to keep her children safe for reasons including her inability to tell the truth, to maintain safe relationships, and to work through her own trauma and recognize her children's trauma. See Adoption of Luc, 484 Mass. at 146-147 (failure to recognize need for or to engage consistently in treatment is relevant to determination of unfitness). The judge's findings as to the mother's failure to protect her children from domestic violence were amply supported by the record. See Custody of Vaughn, 422 Mass. 590, 599 (1996). See also Adoption of Jacob, 99 Mass. App. Ct. 258, 262-263 (2021).

Conclusion. Accordingly, the decrees terminating the father's and the mother's parental rights to each of the three children are affirmed.

So ordered.

By the Court (Sacks, Grant & Smyth, JJ.[18]),

*Joseph F. Stanton*

Clerk

Entered: July 28, 2023.

---

[18] The panelists are listed in order of seniority.

22